[No. B063123. Second Dist., Div. Two. Nov. 17, 1993.]

FELIX E. GIRARD III et al., Cross-complainants and Respondents, v.
DELTA TOWERS JOINT VENTURE, Cross-defendant,
Cross-complainant and Appellant;
DERN, MASON & FLOUM, Cross-defendant and Respondent.

COUNSEL

Gurewitz & Lieb and Robin S. Kurtz for Cross-defendant, Cross-complainant and Appellant.

Robert S. Lewin for Cross-complainants and Respondents.

David S. White and John R. Winandy for Cross-defendant and Respondent.

OPINION

**BOREN, P. J.—**

INTRODUCTION

Appellant Delta Towers Joint Venture (appellant) owned a large office building in Century City and gave its consent to a tenant, respondent law corporation of Dern, Mason, Swerdlow, & Floum (DMF),[1] to sublease a portion of its leasehold to cross-defendant WFI, Inc. (WFI), which was already a subtenant of respondent Mediacom, Inc. (Mediacom). Because appellant gave consent to DMF's sublease to WFI without apprising Mediacom's president, respondent Felix E. Girard III (Girard), of the new sublease, the trial court found appellant liable for the tort of intentional interference with prospective business advantage and for equitable indemnity. The trial court also gave judgment to DMF on appellant's cross-complaint for indemnification. We reverse.

PROCEDURAL BACKGROUND

Appellant filed a complaint for breach of lease and breach of personal guaranty against respondents Mediacom and Girard. Along with their answer to the complaint, respondents filed a cross-complaint against appellant, DMF, WFI and Jerome Schneider (Schneider).[2] The cross-complaint included causes of action for fraud and deceit, conspiracy, interference with prospective business advantage, and indemnity. Appellant also cross-complained against DMF for indemnity. The judgments on the cross-complaints against appellant are the subject of the instant appeal.

After the trial court granted WFI's motion to sever trial on the complaint from trial on the cross-complaints, the parties entered into a stipulated

---

[1] Prior to the conclusion of the trial proceedings the law corporation was reconstituted as "Dern, Mason & Floum."

[2] Samuel Kaufman was also named as a cross-defendant but as to him and DMF the cross-complaint was voluntarily dismissed prior to trial.

judgment on the complaint against Mediacom in favor of appellant in the amount of $39,000 plus interest. Mediacom made a partial payment on this judgment in the amount of $23,400. In accordance with the settlement agreement, Girard was also voluntarily dismissed without prejudice. In conjunction with the dismissal, appellant filed a separate action against Girard (Super. Ct. L. A. County, No. C555201) as to which Girard executed personally a stipulation for entry of judgment also in the amount of $39,000.

After a court trial on the cross-complaints, the court below gave judgment to Mediacom and Girard on their causes of action for interference with prospective business advantage and for indemnification. As to appellant, the trial court awarded Mediacom $72,900, "plus indemnification for any further amount paid to [appellant]" plus interest, costs and attorney fees. Girard was awarded $39,000 plus interest, costs and attorney fees. As to the remaining cross-defendants, the trial court awarded Mediacom $91,181.50 plus interest, costs and attorney fees. The judgment as to these cross-defendants is not before us on this appeal. On appellant's cross-complaint against DMF, the court gave judgment, costs and attorney fees to DMF.

FACTS

1. *The Master Lease of Suite 2020.*

Pursuant to a written lease agreement executed on December 21, 1978, appellant leased to Mediacom suite 2020 (the suite consisted of approximately 2,215 square feet of office space) located on the 20th floor of the "South Tower" in appellant's building complex, known as the Century Plaza Towers, on Century Park East in Los Angeles. The term of the lease was for five years only (commencing Feb. 1, 1979), and the lease expressly provided that another tenant of the building—"the tenant of Suite 2060" (DMF)—had the right to lease the premises at the end of Mediacom's lease term and that Mediacom had no right to extend the lease term or hold over. (The initial monthly rent was $2,482.65.)

With the lease as consideration, Girard, Mediacom's president and chief operating officer, executed (also on Dec. 21, 1978) a personal "Guaranty" in which he guaranteed payment of all rents owed by Mediacom under the lease to appellant and performance of all provisions of the lease.

2. *The Subleases.*

When Mediacom experienced business and financial difficulties (it subsequently went out of business), it subleased, on May 26, 1981, the premises to

WFI with appellant's apparent consent.[3] The term of the Mediacom/WFI sublease was from June 1, 1981, to January 30, 1984. Schneider, WFI's president and chief executive officer, authorized execution of a "Guaranty" to Mediacom regarding WFI's obligations under the sublease. The monthly rent under the sublease of suite 2020 was $5,426.75 and provided Mediacom a monthly profit of $2,749.92 since at that point Mediacom's monthly rent to appellant was $2,676.83.

By August 1982, WFI was in fact "insolvent," had no cash in the bank, and was unable to meet its financial obligations.[4] Around June or July 1982, Schneider told DMF's managing partner, Melvyn Mason, that WFI had suffered a business reversal and was seeking less expensive office space. Mason inquired if WFI "was free to move" and Schneider said it was. Mason told Schneider that offices in DMF's suite on the 20th floor of the same building were available for subletting and were suitable for WFI's needs. Schneider viewed the premises, and Mason also pointed out that the subtenancy would be accompanied by income-producing subsubleases, presenting WFI thereby an opportunity to alleviate its cash-flow problem.

Mason then contacted appellant's agents—either Sam Kaufman or June Walkup—as to "what they thought of [Schneider's] credit-worthiness and his company's status as a tenant." Their response was "generally positive" but Mason was not apprised in the conversation of WFI's relationship to Mediacom and Girard.

On August 3, 1982, with appellant's written consent, WFI subleased from DMF what was designated as "Suite 2095," office space larger than suite 2020 by more than 1,000 square feet, but under the DMF sublease the rate per square foot was $1.80 rather than the $2.45 rate required under the sublease with Mediacom. WFI's new monthly rental obligation was $6,170.40. However, this leasehold included subtenants who paid rent to

[3] The consent form presented by Mediacom is not signed by appellant's representatives, and no signed consent form could be found in appellant's files. The absence of a signed consent may have been caused by questions of appellant's managers about WFI's corporate status or its affiliation agreement with Mediacom. In any event, the trial court properly drew the inference that appellant gave tacit consent since appellant listed WFI as a tenant on the building directory, provided parking and security accommodations for WFI and its employees, and made no objection to WFI's subtenancy. The trial court, however, did not deal directly with Schneider's claim that he *believed* that the Mediacom/WFI sublease was subject to invalidation for want of appellant's written consent.

[4] WFI was "in the business of setting up offshore corporations for individuals [and] corporations around the world" and in April 1982 lost $200,000 on a 2-day conference it had arranged at the Century Plaza Hotel; only 150 people showed up after arrangements were made based on expected attendance of 1,000 people. WFI owed the hotel $41,000, which WFI was unable to pay, and the hotel was threatening to attach WFI's assets.

WFI and improved WFI's cash flow by at least $860 a month. (DMF's previous subtenant had gone bankrupt, and the new sublease permitted WFI to make an accommodation with the former subtenant's sublessees, an accommodation which provided income to WFI. Had no accommodation been reached, WFI's sublease with DMF provided for rent abatement until the subsubtenants were evicted.)

Although WFI contacted appellant's management to request changes to the building directory, parking and security regarding WFI's new location and to obtain appellant's consent for modifications to suite 2095, Schneider told no one employed by appellant that WFI was no longer leasing space from Mediacom. Schneider did not tell any of appellant's employees that WFI was encountering financial problems, nor did appellant's managers have any reason to inquire about WFI's financial condition.

In July 1982, WFI had ceased making rent payments to Mediacom, so Girard caused a three-day notice to quit, dated August 1, 1982, to be served on WFI. Girard also contacted WFI for an explanation. Around the middle of August, Girard spoke with Schneider. Schneider told Girard that WFI was having financial problems, was facing the possibility of filing bankruptcy, and would make no more rent payments to Mediacom. Schneider also stated that his company was going to look for less expensive space and was considering moving out of Century City where appellant's building is located.

Schneider and Girard discussed "some kind of a settlement," and at Schneider's request Girard spoke with WFI's attorney. WFI's attorney reiterated that bankruptcy was likely if WFI could not get out of its sublease with Mediacom and that Mediacom's premises would remain tied up during the pendency of the bankruptcy proceedings. Girard and WFI's attorney negotiated a settlement over the telephone.

On August 30, 1982, when Girard met at the office of WFI's attorney, he was presented with a "Compromise Agreement and General Release," the terms of which cancelled the sublease and released WFI and Schneider from any obligations under the sublease or Schneider's guaranty in exchange for WFI's payment of a sum of money. The written document did not contain the exact terms negotiated over the telephone. The attorney emphasized that bankruptcy would be imminent if the matter was not quickly resolved. Girard and the attorney then discussed the amount of settlement money and the move-out date and reached an agreement that WFI would pay $6,500. Girard then signed the agreement. At no time prior to the execution of the compromise and release did either Schneider or WFI's attorney, or anyone else, inform Girard that WFI had entered into the sublease with DMF.

After signing the compromise and release, Girard spoke with appellant's building manager, Sam Kaufman, and subsequently, June Walkup, appellant's director of leasing, concerning the disposition of suite 2020. This was the first time Walkup knew that WFI had totally vacated the Mediacom suite. Girard asked Kaufman to contact DMF and request that DMF exercise its option rights. Kaufman said that he would inquire about DMF's intentions and would assist Mediacom in finding a new subtenant if necessary. He did not inform Girard that appellant's consent had already been given regarding the DMF/WFI sublease of suite 2095. Girard also told Kaufman that Mediacom was still in financial difficulty and would be unable to pay any rent on its lease of suite 2020.

Girard had several other conversations with Kaufman and Walkup but did not discover that WFI was remaining in the building until he observed WFI moving across the hall to suite 2095 on September 30, 1982.

3. *Nonpayment of Rent for Suite 2020.*

Girard and Mediacom were unable to find another subtenant for suite 2020, and so it remained unoccupied until DMF took it on October 1, 1983, under a new lease with appellant. Girard had contacted Mason regarding DMF's option, but Mason indicated that DMF would not exercise the option until it became operative in 1983. Mediacom had ceased doing business in June 1981 and made no further rent payments to appellant after WFI was released from its obligation to pay rent. In June 1983, DMF exercised its option regarding suite 2020 and executed on August 15, 1983, the new lease of those premises.

## DISCUSSION

The trial court adjudged appellant liable to Mediacom and Girard on the causes of action for intentional interference with prospective economic advantage and for equitable indemnity. It premised liability on findings that "a unique and special relationship existed between Delta and Mediacom by virtue of the lease between them and the circumstances of the case" and that "[b]y virtue of the relationship and the contract, Delta owed a duty of dealing fairly and in good faith with Mediacom, which duty was breached when Delta/Kaufman failed to fully disclose to Mediacom and . . . [gave] its consent to the DMF/WFI Sublease . . . ." We find the trial court's determinations are not supported by the evidence.

The record on appeal does not show either that appellant had any unique or fiduciary relationship with Mediacom or Girard or that appellant owed a

duty to Mediacom to disclose the DMF/WFI sublease. It does show that Girard did not even speak with appellant's agents, Kaufman and Walkup, until after appellant had signed the consent to the DMF/WFI sublease and Girard had signed the compromise and release of WFI. Nor does it demonstrate, or even lead to the inference, that appellant knew its consent to the new sublease would in any way undermine the Mediacom/WFI sublease.

We note first that no fiduciary relationship is established merely because ". . . the parties reposed trust and confidence in each other." (*Worldvision Enterprises, Inc.* v. *American Broadcasting Companies, Inc.* (1983) 142 Cal.App.3d 589, 595 [191 Cal.Rptr. 148].) Nothing in the instant record indicates that the relationship between appellant and Mediacom was any thing other than a garden variety landlord-tenant relationship in a commercial setting. (See *Martin* v. *U-Haul Co. Of Fresno* (1988) 204 Cal.App.3d 396, 412 [251 Cal.Rptr. 17] [" 'California courts have not extended the "special relationship" doctrine to include ordinary commercial contractual relationships . . . .' [Citations.]"]; see also *Copesky* v. *Superior Court* (1991) 229 Cal.App.3d 678, 689-690 [280 Cal.Rptr. 338].) There is certainly no more uniqueness in the parties' relationship here than that of rental equipment franchisor and franchisee in *Martin* v. *U-Haul Co. Of Fresno, supra,* or between the banker and depositer (lender-borrower) in *Mitsui Manufacturers Bank* v. *Superior Court* (1989) 212 Cal.App.3d 726 [260 Cal.Rptr. 793], where the Court of Appeal also found no special or fiduciary relationships had been created. Appellant and Mediacom were not in unequal bargaining positions, they each contracted strictly out of a profit motive, and ordinary damages for breach of a lease were available equally to both. In no way was Mediacom placed in a position of vulnerability. (See *Okun* v. *Morton* (1988) 203 Cal.App.3d 805, 825-826 [250 Cal.Rptr. 220].)

Whether a duty of care is owed with respect to a plaintiff's interests in a prospective economic advantage may be determined by reference to the following criteria: (1) the extent that the transaction is intended to affect the plaintiff; (2) the foreseeability of harm to the plaintiff; (3) the certainty that plaintiff actually suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury suffered; (5) the moral blame attached to the defendant's conduct; and (6) the policy of preventing future harm. (*Worldvision Enterprises, Inc.* v. *American Broadcasting Companies, Inc., supra,* 142 Cal.App.3d at p. 596.) Comparison of the facts in the instant case with the criteria set forth in *Worldvision Enterprises* demonstrates that appellant owed Mediacom no duty to disclose the DMF/WFI sublease or to withhold its consent to it.

First, it defies reason to assume from this record that appellant's agents knew the new sublease would have the effect of causing cancellation of

Mediacom's sublease. If appellant had advance knowledge of this effect and also knew Mediacom was in a financial straitjacket, as Mediacom and Girard contend, it is illogical that appellant would undertake a course of action that would cause its tenant, Mediacom, not to pay rent. The record suggests that DMF, on the other hand, would have continued to pay its rent whether or not WFI became its subtenant. Moreover, appellant could have withheld consent to the DMF/WFI sublease only if it had "a commercially reasonable objection" to the sublease, which it did not have at the time its consent was sought. (*Kendall* v. *Ernest Pestana, Inc.* (1985) 40 Cal.3d 488, 506 [220 Cal.Rptr. 818, 709 P.2d 837].)

Second, the record does not indicate that Mediacom and Girard would have been better off (not have been damaged) had appellant disclosed the new sublease to Girard prior to signing the compromise and release. If anything, WFI's insolvency predicament would have been more severe if it had not obtained the compromise and release agreement. With the obligations of two subleases, it seems more unlikely that WFI could have remained in business given the state of its insolvency and impaired cash flow. It is uncertain whether Mediacom and Girard could have extracted under those circumstances more than the $6,500 it received for the compromise and release. ■ Without "proof that it is reasonably *probable* that the lost economic advantage would have been realized but for the defendant's interference" a cause of action for intentional interference (or even negligent interference) cannot be maintained. (*Youst* v. *Longo* (1987) 43 Cal.3d 64, 71 [233 Cal.Rptr. 294, 729 P.2d 728, 85 A.L.R.4th 1025].)

■ Third, at the time Girard spoke to Kaufman about the cancellation of Mediacom's sublease with WFI, Girard had already signed the compromise and release. It made no difference then whether appellant disclosed WFI's new sublease or not. Girard fully expected WFI to obtain new space somewhere else; he just expected it would be outside Century City, not across the hall. Moreover, this expectation arose out of Schneider's statements to Girard, not out of anything attributable to appellant. The same may be said with respect to WFI's statements that bankruptcy was imminent. We note that although the trial court opined that WFI's bankruptcy statements were "like putting a loaded gun to [Girard's] head" and constituted a "fraudulent act," the reality of WFI's insolvency was unrefuted at trial. In any event, appellant was unaware of those statements and WFI's financial condition and did nothing to advance WFI's threat of bankruptcy.

■ In sum, there was no special or unique relationship between appellant and Mediacom and no special duty outside of those specified in

appellant's leases. Since there was no duty to withhold consent to the DMF/WFI sublease or to advise Mediacom, appellant committed no tort.[5]

■ It also follows that Mediacom failed to prove a right to equitable indemnity. That right rests upon a finding of some liability on the part of the indemnitor as to a tort committed also by another tortfeasor (here, arguably WFI). (See 5 Witkin, Summary of Cal. Law (9th ed. 1988) §§ 89-90, pp. 162-164.) Since we find that appellant was not liable as to any interference with Mediacom's prospective economic advantage, which reposed in Mediacom's sublease with WFI, appellant is not required to indemnify Mediacom or Girard respecting their breaches, respectively, of appellant's lease and guaranty. Therefore, the judgment on the Mediacom/Girard cross-complaint must be reversed and judgment awarded to appellant.

■ Regarding the trial court's finding against appellant on its cross-complaint for contractual indemnity, that, too, must be reversed. Appellant's lease with DMF provided in pertinent part as follows:

¶ 17 "TENANT shall indemnify and hold harmless LANDLORD against and from any and all claims arising from TENANT's use of the Premises or the conduct of its business or from any activity, work, or thing done, permitted or suffered by the TENANT in or about the Premises and shall further indemnify and hold harmless LANDLORD against and from any and all claims arising from any . . . act, neglect, fault or omission of the TENANT, or of its agents or employees, and from and against all costs, attorneys' fees, expenses and liabilities incurred in or about such claim or any action or proceeding brought thereon . . . ."

¶ 31(b) "Should LANDLORD be named as a defendant in any suit brought against TENANT in connection with or arising out of TENANT's occupancy hereunder, TENANT shall pay to LANDLORD its costs and expenses incurred in such suit, including a reasonable attorney's fee."

"Where, as here, the parties have expressly contracted with respect to the duty to indemnify, the extent of that duty must be determined from the contract and not by reliance on the independent doctrine of equitable indemnity. [Citation.]" (*Rossmoor Sanitation, Inc.* v. *Pylon, Inc.* (1975) 13 Cal.3d 622, 628 [119 Cal.Rptr. 449, 532 P.2d 97].) Assuming for the sake of discussion that the indemnity clauses in DMF's lease with appellant are "general [indemnity] clauses" (*id.* at pp. 628-629), DMF could avoid indemnifying appellant only if appellant had been "actively negligent" as opposed

---

[5]Because we reverse the judgment on the cross-complaint of respondents Mediacom and Girard, we need not discuss whether these respondents were entitled to attorney fees on their recovery in tort.

to "passively negligent." (*Ibid.*) Since appellant has not been shown to be negligent at all, DMF is subject to indemnity as provided in the lease. Thus, because the DMF/WFI sublease constituted, in our view, a "use of the premises" and amounts to "conduct of [DMF's] business" and because Mediacom's cross-complaint against DMF and appellant constitutes a "claim[ ] arising from . . . [DMF's] act, neglect, fault or omission," DMF's lease with appellant requires that DMF indemnify appellant for appellant's costs, attorney fees, "expenses and liabilities" incurred with respect to the two cross-complaints which are the subject of this appeal. Appellant is, therefore, entitled to judgment on the first cause of action of its cross-complaint.[6]

### DISPOSITION

The judgments are reversed and the case remanded to the trial court for a determination of appellant's costs and attorney fees, including costs and attorney fees on this appeal.

Gates, J., and Fukuto, J., concurred.

A petition for a rehearing was denied December 16, 1993, and the petition of respondent Dern, Mason & Floum for review by the Supreme Court was denied March 2, 1994.

---

[6]Of course, essentially indentical indemnity provisions appear in appellant's lease with Mediacom (¶¶ 17 and 31(b)) and directly entitle appellant to reasonable attorney fees and coasts as incurred with respect to the cross-complaint of respondents Mediacom and Girard, with cross-complaint was the principal subject of the trial below. Only if appellant is unable to obtain satisaction pursuant to the judgment on that cross-complaint and in accordance with its lease should respondent DMF be subject to indemnifying appellant for the attorney fees and costs related solely to the cross-complaint of Mediacom and Girard.