[No. G013530. Fourth Dist., Div. Three. July 31, 1995.]

JAVAD ILKHCHOOYI et al., Plaintiffs and Respondents, v.
ROBERT T. BEST et al., Defendants and Appellants.

396

COUNSEL

Grant & Laubscher, David C. Grant and DeeAnn M. Taylor for Defendants and Appellants.

Baker & Quella, Baker & Baker, William E. Baker, Jr., Mary Claire Quella and Paige Merrill Baker for Plaintiffs and Respondents.

OPINION

WALLIN, J.—In this case we decide that the doctrine of unconscionability applies to invalidate an express condition on transfer in a commercial lease, despite the Legislature's broad authorization of transfer restrictions and reaffirmation of the principle of freedom of contract in a commercial setting. Citing an express clause in the lease, the lessor of a shopping center refused to allow an assignment to the prospective buyer of a drycleaning establishment unless the transferring tenant paid it a portion of the purchase price. The tenant did not comply and the sale was never consummated. The tenant filed this action against the lessor for declaratory relief, breach of lease and the implied covenant of good faith and fair dealing, and for intentional interference with contractual relations. Following a nonjury trial, the trial court entered judgment in favor of the tenant on all causes of action and awarded $40,000 in damages and $30,000 in punitive damages. The lessor appeals, insisting the lease clause was valid and claiming there was no evidence of bad faith. It also challenges the punitive damages award because there was no evidence of malice or its financial condition. We affirm the award of general damages but reverse the punitive damages.

I. *Statement of facts*

The evidence adduced at trial, in the light most favorable to the respondent (*Clark* v. *Rancho Santa Fe Assn.* (1989) 216 Cal.App.3d 606, 619 [265

Cal.Rptr. 41]), is as follows: in July 1984, Westar Management, Inc.,[1] leased space to the Rosenblatts[2] for a drycleaning establishment in a Garden Grove shopping center. The lease was for a 10-year term, provided for an assignment or sublease with the consent of the landlord, and contained a profit-shifting clause: "[S]hould Tenant receive rent or other consideration either initially or over the term of the assignment or sublease, in excess of the minimum rent called for hereunder, or in case of the sublease of a portion of the Premises in excess of such rent fairly allocable to such portion, Tenant shall pay to Landlord as additional rent hereunder, one-half (1/2) of the excess of each such payment of rent or other consideration received by Tenant promptly after its receipt."

In July 1987, the Rosenblatts sold their business to Javad Ilkhchooyi and Mohammad Bahar, the plaintiffs below (sometimes collectively referred to as Ilkhchooyi), entering into a sublease of the premises approved by Westar. The sublease provided it would terminate if the Rosenblatts' interest under the 1984 lease terminated for any reason.

In June 1988, Ruben and Helen Rosenblatt filed a petition in bankruptcy. Ilkhchooyi received notice of the bankruptcy, but heard nothing from Westar, which continued to accept his rent. In November 1988, Ilkhchooyi wrote a note to Westar referencing the bankruptcy and stating, "You can asign [sic] the lease to us or work out any other arangement [sic] that [is] benifetial [sic] to all." The Rosenblatts were discharged from bankruptcy in February 1989. When Westar received notice of their discharge, it notified Ilkhchooyi that the bankruptcy had terminated the lease and thus he was operating with no possessory rights to the premises. Westar offered to negotiate a new lease, and sent Ilkhchooyi forms for financial and other information needed to do so. Ilkhchooyi testified that although he did not believe the lease had been terminated by the bankruptcy, he filled out the forms and returned them to Westar.

In May 1989, Barbara Lamb, Westar's director of leasing, sent Ilkhchooyi a proposed lease requesting his signature and a check for the balance of the security deposit, which had been increased from one to two months minimum rent. Ilkhchooyi did not respond for a month, testifying he tried to compare the new lease with the old "as much as I could" during that time. Although he knew he should consult an attorney, he decided not to because "I wasn't making enough money to even feed myself."

---

[1] For convenience, we refer to the appellants collectively as Westar. They also include Robert T. Best and Garden Grove Investors I; Paul C. Best was dismissed at the completion of the trial.

[2] The Rosenblatts consisted of two couples: Ruben and Helen Rosenblatt, and Bruce and Joni Rosenblatt.

On June 28, Lamb wrote again and stated the offer to lease would be withdrawn if the executed forms were not received by July 5. Ilkhchooyi called her and complained because "they had promised me they were going to give me exact lease. I said this is not the exact lease." He demanded to know why the security deposit had been increased and why Bahar's wife was on the new lease when she had not been included on the sublease. Ilkhchooyi testified Lamb said, "[T]his is the way it is, take it or leave it." They got into a heated argument about the changes, and Ilkhchooyi told her he would not sign the new lease. She threatened to evict him if he did not, and assured him it was basically the same lease as the sublease. Ilkhchooyi ultimately did sign the new lease and sent it to Lamb, but he scratched out Bahar's wife's name and included a note indicating he did not accept it. In this note, he agreed to the increase in the deposit; noted that the new lease was not the same as the sublease as promised; and demanded that the effective document be the original lease of July 13, 1984, amended to reflect the deposit increase and to substitute him and Bahar for the Rosenblatts as lessees. Westar did not respond to Ilkhchooyi's comments, but decided to accept the new lease without Bahar's wife's signature and signed the document.

In May 1990, Ilkhchooyi and Bahar entered into an agreement to sell the dry cleaning business to Ramsin Zobalan for $120,000. The escrow instructions allocated $80,000 to fixtures and equipment and $40,000 to a covenant not to compete. Ilkhchooyi testified he and Zobalan determined his existing lease was higher than the current market, so the value of the lease added nothing to the sales price of the business.

When Ilkhchooyi sought Westar's consent to the assignment of the lease, Westar responded in a letter dated July 6, and pointed out paragraph 14c of the 1989 lease. This paragraph provided in part: "If in connection with the transaction involving the proposed assignment or sublease, tenant receives rent or other consideration, including without limitation any consideration for tenant's business, business opportunity, good will, a covenant not to compete and/or the like, either initially or over the term of the assignment or sublease, in excess of all sums then payable hereunder, whether as minimum rent, percentage rent, or otherwise, . . . tenant shall pay to landlord as additional rent hereunder three-quarters (3/4) of the excess of each such payment of rent or other consideration received by tenant promptly after its receipt." Westar demanded arrangements be made for the payment of three-quarters of the value of the covenant not to compete, or $30,000, to it through escrow before it would consent to the assignment.

Ilkhchooyi testified that before he received Westar's letter of July 6, he and Zobalan had modified the escrow instructions on the advice of his

accountant to delete the covenant not to compete and reallocate the $40,000 to leasehold improvements. Ilkhchooyi informed Westar of this and stated his intention not to pay Westar $30,000. Westar responded by turning the matter over to its attorney, Douglas Alani, who wrote Ilkhchooyi's attorney on August 15 insisting on the payment of $30,000. "Be advised that Landlord does not consent to the Assignment of the Lease at this time. Mr. Ilkhchooyi is still obligated to pay Landlord Thirty Thousand Dollars ($30,000) in consideration for the covenant not to compete. Your client's surreptitious amendment to the Escrow Instructions, after receipt of notification of Landlord's demand for consideration pursuant to the Lease, will not relieve him of this obligation."[3]

During July, Westar's property management personnel had noticed "unfamiliar people" operating the business during "routine visits." Accordingly, Alani's August 15 letter also expressed Westar's concern that persons other than Ilkhchooyi were operating the business, and warned against an unauthorized assignment of the lease. Alani stated, "I have advised my client not to accept any rent checks from any party other than Mr. Ilkhchooyi."

In September, Zobalan attempted to pay the rent with a check drawn on the business account and signed by him. Westar refused to accept the check and notified Ilkhchooyi on September 6 that Zobalan was "in possession of the Premises in violation of the Lease and without the consent of Landlord. . . . Until such time as the proposed assignment has been consented to by Landlord in writing, Landlord will only accept rent checks from you." Westar also informed Ilkhchooyi the assignment of the lease had been approved "conditioned upon the payment of the $30,000 . . . for the covenant not to compete. Ilkhchooyi testified Zobalan was working on the premises as an employee at that time and had been authorized to sign on the business checking account. This was apparently unknown to Westar.

Ilkhchooyi was concerned about the September 6 letter from Westar because of "the unreasonable demand for $30,000," because Westar "had been spying on my business to see who is running my business, telling me who should run, who should not," and because "unreasonably, he sends . . . my check back because somebody else had signed it." Zobalan said he would not purchase the business "until the landlord stops interfering in the operation of the business." As a result of the letter, Zobalan reduced the price he was willing to pay for the business from $120,000 to $80,000.

---

[3]On appeal, Westar advances the argument that all it really wanted to recover was three-quarters of the leasehold improvements, which, by the terms of the lease, belonged to the lessor anyway. It is clear from the record, however, that at the time of the dispute and at trial, Westar repudiated Ilkhchooyi's recharacterization of the purchase price and sought to recover a portion of the covenant not to compete.

On October 2, Ilkhchooyi's attorney explained to Westar that Ilkhchooyi had not assigned the lease and that Zobalan was an employee. Westar then agreed to accept future checks from Zobalan. Zobalan testified he reduced the price for the business "because of having a landlord like this being interference . . . . [W]hen I first send a check and it came back, I was very, very surprised, like I said, because it's just a shocking, you know, why would the landlord do something like this." Zobalan testified he never received an explanation of the rejection and would never have signed a lease that required him to pay the landlord a portion of the consideration upon sale of the business.

The trial court found that Westar "wrongfully took a position that the discharge of the Rosenblatts terminated the master lease and thereby the sub-lease. . . . [¶] While paragraph 21(D) of the original lease deems a tenant in default upon discharge of bankruptcy, the lease also provides that the landlord's remedy [*sic*] set forth in paragraphs 21 (A) and (B) are permissive and optional. The landlord may elect to continue with the lease without forfeiting any rights." It found Westar's position was improved by the receipt of rents under the sublease following the bankruptcy, and Westar's requirement of a new lease "was only a means to gain an economic advantage over [Ilkhchooyi]." It deemed the threat to terminate the tenancy in 30 days was "oppressive." Accordingly, the trial court declared the lease of July 7, 1989 void and found the parties relationship was governed by the lease of July 13, 1984 and the sublease of July 16, 1987.

The trial court also declared the profit-shifting clauses in both leases void, stating: "Here the landlord attempts to share in the profit from the sale of the business totally unrelated to the market rents. To expect to share in the good will or non-competition agreement is not only unfair, it's unconscionable. . . . A surcharge on the economic asset of the business itself is without any contractual basis and cannot be allowed. Here the landlord seeks to extract 75% of the good will or initially a covenant not to compete. Court finds that is ridiculous . . . ."

The trial court entered judgment for Ilkhchooyi on the causes of action for declaratory relief, breach of lease and the covenant of good faith and fair dealing, and intentional and negligent interference with prospective economic advantage; and awarded general damages "as to the entire action" in the amount of $40,000. It awarded punitive damages in the amount of $30,000 "based upon the $30,000 which I felt the landlord was trying to wrongfully extract from the plaintiffs . . . ."

II. *The bankruptcy terminated the 1984 lease, leaving the 1989 lease to govern the relationship between the parties.*

■ The trial court found Westar's wrongful and oppressive conduct invalidated the 1989 lease, thus leaving the 1984 lease and its sublease to govern the relationship between Westar and Ilkhchooyi. This finding was erroneous for several reasons.

First, the 1984 lease and the sublease were terminated by operation of law due to the bankruptcy of the Rosenblatts. Under the Bankruptcy Code, "if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is lessee within 60 days [of the filing of its bankruptcy petition] . . . , then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential property to the lessor." (11 U.S.C. § 365(d)(4).) The parties agree that the bankruptcy trustee neither assumed nor rejected the Rosenblatts' 1984 lease within 60 days of the filing of their bankruptcy petition; thus, it was rejected by operation of law. (See also Friedman et al., Cal. Practice Guide: Landlord-Tenant (The Rutter Group 1993) ¶ 10:20 et seq., p. 10-4.2 et seq.)

Once the lease is rejected in bankruptcy, it is terminated as to all parties, including those with an interest derived from the bankrupt. (*366-388 Geary St., L.P.* v. *Superior Court* (1990) 219 Cal.App.3d 1186, 1197 [268 Cal.Rptr. 678]; *Chatlos Systems, Inc.* v. *Kaplan* (Bankr. D.C.Del. 1992) 147 Bankr. 96 [1]; *Stalter & Company, Ltd.* v. *Loyola Associates* (Bankr. E.D.La. 1989) 99 Bankr. 327 [1].) In *Stalter,* the court distinguished the situation where the debtor is the lessee from that where the debtor is the lessor. In the latter situation, if the trustee rejects an unexpired lease under which the debtor is the lessor, the lessee may treat the lease as terminated by rejection or may remain in possession of the leasehold for the balance of the term. (11 U.S.C. § 365(h)(1).) But "[the debtor's] rejection as lessee of the Master Lease, by terminating the very rights that [the debtor] had sublet to [the sublessee], caused the demise of the Sublease and deprived [the sublessee] of any right to occupy the Leased Premises." (99 Bankr. at p. 331.)

Second, the 1984 lease contains a clause providing that "the filing by or against Tenant of a petition to have Tenant adjudged a bankrupt" constitutes a default and breach of the lease, allowing the landlord to terminate the right to possession at any time. Thus, Westar had the contractual right to terminate the interests of the Rosenblatts and Ilkhchooyi. Although it could elect to continue the lease following the bankruptcy, it was not required to do so. Informing Ilkhchooyi that he was under a periodic tenancy that could be terminated on 30 days' notice was not oppressive, as the trial court found,

because it was an accurate description of the parties' legal relationship. (Civ. Code, §§ 1943, 1946.)

III. *The profit-shifting clause in the 1989 lease is not authorized by statute and has not been sanctioned by the Supreme Court.*

 Westar argues that the profit-shifting clause in the 1989 lease is specifically authorized by Civil Code section 1995.240, which provides, "A restriction on transfer of a tenant's interest in a lease may provide that the transfer is subject to any express standard or condition, including, but not limited to, a provision that the landlord is entitled to some or all of any consideration the tenant receives from a transferee in excess of the rent under the lease." Westar claims the term "any consideration" encompasses not just consideration attributable to the leasehold interest but consideration for the business itself, including a covenant not to compete. Our role when construing a statute is to ascertain the legislative intent; we turn to the legislative history of the section to effectuate that purpose. (See *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1993) 6 Cal.4th 1112, 1127 [26 Cal.Rptr.2d 231, 864 P.2d 502].)

Civil Code section 1995.240 was part of legislation sponsored by the Law Revision Commission and introduced as Senate Bill No. 536; it was enacted in September 1989. (Stats. 1989, ch. 982, p. 3446.) Amending portions of Civil Code section 1951.4 and adding a new chapter to the Civil Code (Civ. Code, § 1995.010 et seq.),[4] the legislation was intended to clarify rules regarding transfer restrictions in commercial leases in the wake of the Supreme Court's opinion in *Kendall* v. *Ernest Pestana, Inc.* (1985) 40 Cal.3d 488 [220 Cal.Rptr. 818, 709 P.2d 837]. Before *Kendall*, a lease requiring the landlord's consent to an assignment or sublease was construed to allow the landlord to withhold its consent arbitrarily unless the consent clause specified a different standard. In *Kendall*, the Supreme Court adopted the minority view that ". . . where a commercial lease provides for assignment only with the prior consent of the lessor, such consent may be withheld only where the lessor has a commercially reasonable objection to the assignee or the proposed use." (*Id.* at pp. 506-507.)

The provision of section 1995.240 regarding the shifting of profits on the transfer of a leasehold emanated from a footnote in the *Kendall* case: "[W]e make [it] clear that . . . 'nothing bars the parties to commercial lease transactions from making their own arrangements respecting the allocation of appreciated rentals if there is a transfer of the leasehold.'" (*Kendall* v. *Ernest Pestana, Inc., supra,* 40 Cal.3d at p. 505, fn. 17.) In a law review

---

[4]All statutory references are to the Civil Code.

article solicited by the Law Revision Commission as a background study for their recommendation, Professor William Coskran observed that the court had apparently approved a "profit shift" clause which allowed the lessor to profit from the assignment or sublease. (Coskran, *Assignment and Sublease Restrictions: The Tribulations of Leasehold Transfers* (1989) 22 Loyola L.A. L.Rev. 405, 447.) Professor Coskran explained the motive behind such a clause: "The tenant and lessor share the motive to profit from an appreciation in the rental value of the premises. When the rental value increases above the agreed rent in the lease, the difference creates a leasehold bonus value. So long as there is no transfer, the tenant indirectly enjoys the benefit by occupying property which is worth more rent than he is obligated to pay. However, when a transfer occurs, both the landlord and the tenant would like the profit generated from the third party who comes into the premises with a higher rental value. It is at that point that a dispute is likely to occur, and questions of express language and reasonableness become involved." (*Id.* at p. 422.)

Thus, section 1995.240 had its genesis in the concept of appreciated rental value. And the materials left in the path of the legislation indicate it was assumed the consideration in question related to the rental value of the premises. Among the comments solicited by the commission on its tentative recommendation was one by a senior real estate attorney for the Gap, Inc. Arguing against legitimizing the profit-shifting clause as a per se reasonable condition of the landlord's consent to transfer, he framed the problem as follows: "Many landlords resent the fact that a tenant may transfer the lease and retain the appreciation in rental value ('bonus value' or 'profit') that has occurred since the lease was first signed. They vehemently complain that the *landlord* is in the real estate business rather than the tenant. While this statement is true, it fails to take into account the magnitude of the risk assumed by the tenant in a commercial lease. . . . The landlord really wants to have it both ways—to receive the agreed-upon rent while at the same time be guaranteed fair rental value despite his failure at the time of lease execution to negotiate a more favorable rent scheme to protect him in the future. He seizes upon the opportunity of an assignment to realize the increase in rental value. [¶] It must be remembered that no one is taking money out of the landlord's pocket—at best, we are talking about a windfall caused by rising real estate values." (Cal. Law Revision Com. Study H-111, exhibit 5 (Letter to Cal. Law Revision Com. re: Tentative Recommendation, Commercial Real Property Leases, Assignment and Sublease by Joel R. Hall, Sr. Atty. for the Gap, Inc., dated Dec. 13, 1989) italics in original).)

The use of "consideration" in section 1995.240 was specifically discussed in a staff analysis of the bill prepared for the Senate Judiciary Committee.

"Of all the proposed rules on permissible transfer restrictions in a lease, the most controversial provision is that of proposed Section 1995.240 . . . . [¶] The provision in question reflects an affirmation of a footnote in the *Kendall* decision that parties may agree to an express lease provision governing allocation of 'appreciated rentals' if there is a transfer of the leasehold. . . . [¶] The term 'consideration' is vague and could be interpreted to apply to payments for goodwill or fixtures, or other items not related to a payment for the value of the lease." The analysis suggested "consideration" be clarified. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 536 (1989-1990 Reg. Sess.) May 16, 1989.) This clarification appears in the final version of the Law Revision Commission comment to the section: "As used in this section, 'consideration' includes 'appreciated rentals' or any other term or description used by the parties to define any bonus value of the leasehold interest or any consideration attributable to the value of the leased premises that may be subject to sharing or shifting between the parties pursuant to contract in case of transfer by the tenant." (Cal. Law Revision Com. com., 10 West's Ann. Civ. Code, § 1995.240 (1995 pocket supp.) p. 72.)

In light of the context and history of the legislation, it is clear the Legislature intended the term "consideration" in section 1995.240 to be limited by its connection to the value of the lease. "[O]nce the purpose of the legislation has been ascertained, it must prevail over a strict, literal reading . . . ." (*Santa Barbara County Taxpayers Assn. v. County of Santa Barbara* (1987) 194 Cal.App.3d 674, 680 [239 Cal.Rptr. 769].)

Westar also insists its profit-shifting clause has been expressly approved by the Supreme Court in *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342 [6 Cal.Rptr.2d 467, 826 P.2d 710]. But the clause held valid in *Carma* gave the lessor, upon notice by the lessee of intent to sublet or assign, the option to terminate the lease and recapture the leasehold or reasonably consent to the transfer. Because the lessor exercised its termination option in order to realize the appreciated rental value of the leasehold, the court found the clause was authorized by the new legislation, pointing out that section 1995.240 allowed the lessor to recapture appreciated rental value. (2 Cal.4th at p. 371.) Here, there was no appreciated rental value to be recaptured. Westar was attempting to share in the consideration for the business itself.

IV. *The trial court correctly found the profit-shifting clause in the 1989 lease unconscionable and refused to enforce it.*

A. *The 1989 legislation broadly authorizes restrictions on transfer.*

Westar argues even if its profit-shifting clause is not specifically authorized by section 1995.240, it is nonetheless valid as an express bargained-for condition of transfer. Westar claims the 1989 legislation was

intended to reaffirm the principle of freedom of contract in a commercial lease and to authorize all transfer restrictions expressly stated. The legislative history confirms that the Commission was concerned about *Kendall*'s reliance on the doctrine against unreasonable restraints on alienation and the implied covenant of good faith and fair dealing to reach its conclusion that a reasonable consent standard is implied where the lease requires the lessor's consent to transfer but specifies no standard. The Commission recommended the abolition of these principles in the commercial lease context and urged the Legislature to free all types of express restrictions on transfer from attack as an unreasonable restraint on alienation or as a violation of the duty of good faith, subject only to "the general restrictions on freedom of contract." (Recommendation Relating to Commercial Real Property Leases (Feb. 1989) 20 Cal. Law Revision Com. Rep. (1990) p. 259.)[5]

The Legislature adopted the commission's recommendations. The chapter confirms the validity of an express restriction on transfer in a commercial lease (§ 1995.210, subd. (a)), authorizes an *absolute prohibition on transfer* (§ 1995.230), and allows the restriction to be subject to "any express standard or condition" (§ 1995.240). The commission's final comments verify the breadth of the new law's intent: "Neither the law governing unreasonable restraints on alienation . . . nor the law governing the implied covenant of good faith and fair dealing . . . prevents the enforcement of a restriction on transfer in accordance with the express terms of the restriction." (Cal. Law

---

[5]In its recommendation, the commission explained, "*Kendall* dealt only with a lease clause that requires the landlord's consent but that fails to state a standard for giving or withholding consent. However, the reasoning of the decision raises issues concerning the validity of other types of lease restrictions on transfer. The court's concern over unreasonable restraints on alienation and the court's importation of the good faith and fair dealing doctrine into lease law could easily affect other types of restrictions on lease transfer. The Commission believes a systematic statutory exposition of the governing law in this area is necessary to avoid many years of litigation and uncertainty. [¶] The statute should reaffirm the governing principle of freedom of contract between the parties to a lease and honor the reasonable expectations of the parties based on their agreement. The parties should be able to negotiate any restrictions on transfer that are appropriate for the particular transaction with the assurance that the restrictions will be enforced. While this fundamental principle assumes some bargaining ability by both parties to the lease, it does not necessarily assume equality of bargaining position. Either the landlord or the tenant may have superior bargaining power depending on its financial condition, its representation by legal counsel, the economics of the commercial lease market, and other factors. Where the situation is such that the lease is a contract of adhesion or the particular clause is unconscionable, for example, general principles limiting freedom of contract will govern. [¶] The parties should also be able to agree on standards and conditions for transfer, and those standards and conditions should be enforceable. The conditions might include, for example, that the landlord is entitled to recapture any consideration realized by the tenant as a result of a transfer. So long as the limitation satisfies the general restrictions on freedom of contract, it should be recognized as valid." (Recommendation Relating to Commercial Real Property Leases, *supra*, 20 Cal. Law Revision Com. Rep., pp. 257-259, fns. omitted.)

Revision Com. com., 10 West's Ann. Civ. Code, § 1995.210 (1995 pocket supp.) p. 71.) The commission was careful to point out, however, that this broad authority "remains subject to general principles limiting freedom of contract. See, e.g., 1 B. Witkin, Summary of California Law *Contracts* §§ 23-36 (9th ed. 1987) (adhesion and unconscionable contract doctrines)." (*Ibid.*)[6]

### B. *Westar's clause is unconscionable.*

A party to a commercial lease who is trapped in a bad bargain has only one escape route left: to invoke the doctrines of adhesion and unconscionability. In the face of the strong legislative policy in the 1989 legislation, the challenger to an express restriction on transfer has a formidable burden. Nevertheless, Westar's profit shifting clause is unconscionable.

The established doctrine that a court may refuse to enforce an unconscionable provision in any contract was codified in 1979 in section 1670.5: "(a) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." Although the section's coverage includes noncommercial contracts as well as commercial ones, it is based on Uniform Commercial Code section 2-302; thus, the roots of the doctrine are in a commercial setting. (*Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913, 925, fn. 10 [216 Cal.Rptr. 345, 702 P.2d 503].)

In *A & M Produce Co.* v. *FMC Corp.* (1982) 135 Cal.App.3d 473 [186 Cal.Rptr. 114, 38 A.L.R.4th 1], the court delved into the definition of unconscionability and reported that the term " 'has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.' [Citation.]" (*Id.* at p. 486.) The court then analyzed unconscionability as having procedural and substantive elements, both of which must be present to invalidate a clause. The procedural element includes (1) oppression "aris[ing] from an inequality of bargaining power which results

---

[6]This has been confirmed by the Supreme Court. "Other than the requirement that ambiguous provisions be interpreted in favor of transferability, the new chapter contains no limitations on the breadth of transfer restrictions. Thus, other than general contract limitations regarding unconscionable agreements and general restrictions against discrimination or other such statutory or constitutional prohibitions, none of which is applicable here, the parties' power to restrict transfer is unlimited." (*Carma Developers (Cal.), Inc.* v. *Marathon Development California, Inc., supra,* 2 Cal.4th at p. 371.)

in no real negotiation and 'an absence of meaningful choice' [citation]"; and (2) surprise "involv[ing] the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms. [Citation.]" (*Ibid.*) The substantive element includes terms that are one-sided, lacking in justification, and "reallocate[] the risks of the bargain in an objectively unreasonable or unexpected manner." (*Id.* at p. 487.)

██ Here, both the procedural and substantive aspects of unconscionability are present. The profit-shifting clause was buried in diminutive print in the middle of one of five lengthy paragraphs under the heading "Assignment and Subletting." Ilkhchooyi noticed certain differences from the original lease, such as the addition of Bahar's wife and the increase in the security deposit, but these terms were clearly set out in large type on the first page of the lease. When he attempted to investigate the differences in the two leases, he was assured by Westar's agent that the new lease was basically the same as the original. But the profit-shifting clause in the new lease was very different, specifying Westar was entitled to 75 percent of any consideration for the business itself.

" 'The burden should be on the party submitting [a standard contract] in printed form to show that the other party had knowledge of any unusual or unconscionable terms contained therein.' " (*A & M Produce Co.* v. *FMC Corp.*, *supra*, 135 Cal.App.3d at p. 490; see also *Ellis* v. *McKinnon Broadcasting Co.* (1993) 18 Cal.App.4th 1796, 1804 [23 Cal.Rptr.2d 80].) The profit-shifting clause in the new lease must certainly be considered "unusual"; Ilkhchooyi had no reason to suspect, given Lamb's assurances, that it was included. Furthermore, Lamb's "take it or leave it" attitude, a hallmark of an adhesive contract, indicates there was no meaningful negotiation over the terms. Although Ilkhchooyi managed to prevail on the omission of his partner's wife's name, this was ultimately accepted by Westar as unimportant.

We concede, however, that the procedural infirmities of this case alone would not sustain a finding of unconscionability in the context of a commercial lease. ██ But there is a "sliding scale relationship between the two concepts [of procedural and substantive unconscionability]: the greater the degree of substantive unconscionability, the less the degree of procedural unconscionability that is required to annul the contract or clause. [Citations.]" (*Carboni* v. *Arrospide* (1991) 2 Cal.App.4th 76, 83 [2 Cal.Rptr.2d 845].) And it is the substantive unconscionability of the clause in question that concerns us the most.

██ Westar's preprinted 1989 lease prohibits the transfer of the leasehold without Westar's prior written consent, "which shall not be unreasonably withheld." Additionally, it gives Westar the right to elect to terminate

the lease upon a proposed assignment (as in *Carma*), or, if it consents, to increase the minimum rent to the market value. Thus, Westar's legitimate interest in the possible increase in rental value is amply protected. Westar's attempt to appropriate a portion of the sales price for the business was blatant overreaching. Although the Legislature has insulated express transfer restrictions in commercial leases from attack as unreasonable restraints on alienation or as breaches of good faith, it did not intend to allow commercial lessors to gouge their tenants in the name of freedom of contract.

Unconscionability is ultimately a question of law. In determining whether the trial court's determination of unconscionability was correct, "we must assume a set of facts consistent with the [trial] court's finding of unconscionability if such an assumption is supported by substantial evidence." (*A & M Produce Co.* v. *FMC Corp.*, *supra*, 135 Cal.App.3d at p. 489.) Substantial evidence supports the trial court's findings and the profit-shifting clause is unconscionable as a matter of law.

Under section 1670.5, the trial court had the power to strike that portion of paragraph 14(c) of the 1989 lease. Westar refused its consent to transfer the lease to Zobalan solely because Ilkhchooyi would not pay it $30,000 of the sum he was to receive for the covenant not to compete. In the absence of the offending clause, Westar's refusal to consent was wrongful and resulted in Zobalan reducing the price he was willing to pay for the business from $120,000 to $80,000. Ilkhchooyi was entitled to a judgment establishing that Westar's refusal of consent was wrongful and to damages for breach of the lease. "For the breach of an obligation arising from contract, the measure of damages . . . is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby . . . ." (§ 3300.) The trial court's award of $40,000 is supported by Ilkhchooyi's cause of action for breach of lease.

V. *The evidence does not support recovery in tort; thus, the punitive damages must be stricken.*

Although Ilkhchooyi sued Westar for intentional interference with prospective advantage and contractual relations, these tort causes of action cannot be sustained and the punitive damages must be stricken. Ilkhchooyi complains of two things: Westar insisted on enforcing the unconscionable profit-shifting clause; and it upset Zobalan with its refusal to accept his check, causing him to lower the purchase price of the business.

Ilkhchooyi's claim regarding the profit-shifting clause is grounded in contract: the dispute is over an express term in the lease, and the doctrine of

unconscionability is a contract principle. "Conduct amounting to a breach of contract becomes tortious only when it also violates an independent duty arising from principles of tort law." (*Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515 [28 Cal.Rptr.2d 475, 869 P.2d 454].) These were parties to a commercial lease; as such, they were in no special relationship that would give rise to a duty in tort. (See *Girard* v. *Delta Towers Joint Venture* (1993) 20 Cal.App.4th 1741 [26 Cal.Rptr.2d 102].)

Likewise, Westar's refusal to accept Zobalan's check does not constitute tortious behavior. While we decline to hold a commercial tenant could *never* recover in tort for a lessor's wrongful interference with the tenant's economic relations, we are confident that such a cause of action could never be sustained on this evidence. There is nothing in the record to suggest Westar's refusal of Zobalan's check was intended to disrupt his relationship with Ilkhchooyi.

■ Tort damages are designed to vindicate social policy and to compensate the victim for injury suffered, including mental suffering and emotional distress; punitive damages, available only for the "breach of an obligation not arising from contract," (§ 3294, subd. (a)), are designed to punish and deter wrongful conduct. By contrast, contract damages seek to approximate the agreed-upon performance by allowing the injured party to recover what he would have received had the contract been performed. The motive of the party breaching a contract has no bearing on the scope of damages recoverable. (*Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.*, *supra*, 7 Cal.4th at pp. 514-516.) Ilkhchooyi is made whole by the recovery of contract damages; recovery in tort would be superfluous.

The award of $30,000 in punitive damages is stricken. As so modified, the judgment is affirmed. The parties will bear their own costs of appeal.

Sills, P. J., and Sonenshine, J., concurred.

A petition for a rehearing was denied August 22, 1995.