[No. A097471. First Dist., Div. Three. Dec. 20, 2002.]

SYUFY ENTERPRISES, L.P., Plaintiff and Appellant, v.
CITY OF OAKLAND, Defendant and Respondent.

**COUNSEL**

Miller, Starr & Regalia, Marvin B. Starr and Basil S. Shiber for Plaintiff and Appellant.

Pinnacle Law Group, Andrew A. August, John L. Fitzgerald; David L. Alexander and Vivian M. O'Neal for Defendant and Respondent.

**OPINION**

**PARRILLI, J.**—After a master tenant rejects a nonresidential real estate lease in bankruptcy, does a subtenant who is an intended beneficiary of the lease have a right to remain in possession of the property? The trial court in this case decided the answer is "no." Accordingly, the court granted a nonsuit and dismissed all claims by Syufy Enterprises, L.P. (Syufy) against the City of Oakland arising from Syufy's eviction from a property near the Oakland Airport, where Syufy had operated a movie theater. The court found Syufy lost its right to possession of the property, which Syufy occupied under a sublease, after the primary lease was "deemed rejected" by the sublessor tenant in the sublessor's bankruptcy proceedings. In a companion unlawful detainer action, an appellate division of the superior court had previously decided the legal issue concerning the effect of a "deemed rejection" in Syufy's favor; therefore, Syufy contends the trial court erred in failing to give this decision preclusive effect. Syufy also claims the court's decision was substantively wrong because Syufy was entitled to possession as a third party beneficiary of the primary lease. We conclude the litigation was not procedurally barred and the trial court correctly resolved the substantive legal issue. Therefore, we affirm.

BACKGROUND

In 1960, the Port of Oakland (Port) leased a 10-acre parcel of land to Transwestern Hotels for the construction of a hotel. They signed a lease (which the parties call the Master Lease) with a 50-year term, commencing in 1960 and ending in 2010. The Port later agreed to several assignments of the lease.

In 1968, the Port and the current lessee, Security Savings and Loan Association, executed an amendment to the Master Lease titled the "Fifth Supplemental Agreement." In this document, the Port agreed to lease the tenant an adjoining parcel of land for the immediate construction of a motion picture theater. Two provisions are of particular significance to this appeal. In paragraph three of the Fifth Supplemental Agreement, the parties agreed that the Master Lease would be amended to include, among other things, the statement: "It is understood and agreed by the parties hereto that Lessee intends to cause said improvements to be constructed by its sublessee, SYUFY ENTERPRISES, INC. . . ." The parties amended another section of the Master Lease to state: "Notwithstanding the provisions of this Paragraph 10 [concerning requirements for subleases and assignments], it is understood and agreed that Lessee may sublease Parcel Two to SYUFY ENTERPRISES, INC. . . ." The Fifth Supplemental Agreement again specified a term ending in June 2010. In August 1968, the Port passed a resolution expressly consenting to Syufy's tenancy on the property.

Syufy subleased the theater parcel from Security Savings and Loan Association in June 1968, for a term of 15 years with an option to extend the sublease until June 2010. In the sublease agreement, Syufy agreed to assume, perform and be bound by all covenants in the Master Lease except those concerning operation of the hotel. Syufy then built and operated a theater on the site and timely exercised its option to extend the sublease through 2010. By the early 1980's, Syufy had divided its single theater into four auditoriums, and in 1988 Syufy added more auditoriums and substantially remodeled the facility. The Port consulted with Syufy and approved all of these expansions.

During Syufy's tenancy, the Master Lease was assigned to several different hotel lessees, with the Port expressly consenting to the assignment each time. In November 1990, the current lessee assigned its rights under the Master Lease to the Oakland Airport Hotel Corporation (OAHC). Disputes soon arose between the Port and OAHC about how the hotel was operated. Beginning in 1991, the Port served OAHC several notices of default under the Master Lease, referencing OAHC's alleged failure to operate a "first

class" hotel on the site. Syufy received copies of two such notices and contacted the Port, but a representative of the Port assured Syufy no action was necessary and the Port did not intend to disturb Syufy's tenancy. The Port never directed a notice of default against Syufy or alleged any default by Syufy.

In January 1994, the Port filed an unlawful detainer action against OAHC. The complaint did not name Syufy, nor was it served on Syufy. OAHC failed to answer the complaint and, after the Port obtained a default judgment against it, OAHC filed a petition under chapter 11 of the Bankruptcy Code. The OAHC trustee filed a motion to assume the Master Lease, but the bankruptcy court denied this motion.[1] OAHC's motion for reconsideration was denied, and its appeal from the ruling was dismissed. On July 15, 1994, the bankruptcy court ordered OAHC to vacate the premises it had leased from the Port. The order did not mention Syufy, and Syufy received no notice of the order.

Syufy remained unaware of the OAHC bankruptcy proceedings until August 1994, when the Port sent Syufy a letter explaining that a United States Bankruptcy Court had ordered OAHC to vacate the hotel property. The Port stated: "As a result of the court's orders, the lease between the Port and the Hotel has been terminated. In addition, as Syufy is a subtenant under the Hotel lease, the court's orders effectively terminates [sic] Syufy Enterprises's sublease with the Hotel." However, the Port went on to assure Syufy that on August 9, 1994, the board of port commissioners had approved a resolution "to allow Syufy to continue its occupancy of the premises on a month-to-month basis upon the same terms and conditions of the sublease between Syufy Enterprises and the Hotel," after Syufy provided proof of insurance and a plan for making security patrols of the property. The Port's letter concluded by requesting that Syufy sign the letter to indicate its desire to enter a month-to-month agreement with the Port on the stated terms. When it received this letter, Syufy contacted the Port and was told the Port did not intend to disturb Syufy's tenancy. The Port explained it wanted to formalize a new lease with Syufy to avoid any possible claim by the OAHC bankruptcy trustee that Syufy's rent payments to the Port were assets of the bankruptcy estate. The Port's director of commercial real estate told Syufy the Port wished to enter a direct lease with Syufy through June 2010 or longer. After these discussions, Syufy's president signed the Port's letter.

Syufy continued to operate the theater, although the Port did not prepare a new lease for Syufy and the parties signed no new agreements. The Port

---

[1]The denial was based on the court's earlier decision granting the Port leave to enforce its default judgment against OAHC despite the automatic stay imposed by the bankruptcy. The court observed the result might have been different if OAHC had acted promptly to set aside the default in state court.

operated the hotel itself, through a management company, until 1996. In late 1996 or early 1997, the Port decided to market the site for a new commercial development and so demolished the hotel. In May 1998, Syufy notified the Port of its desire to extend the lease through June 2010. But on October 19, 1998, the Port sent Syufy a notice of termination of tenancy, ordering Syufy to vacate the theater premises within 30 days. The Port had made no effort to evict Syufy before this October 1998 notice.

In response to the notice of termination, on December 10, 1998, Syufy sued the Port in the Alameda County Superior Court for declaratory relief and damages. The following month, the Port filed an unlawful detainer action against Syufy in the Alameda County Municipal Court. The parties stipulated to consolidate the two actions for discovery and case management purposes. They further agreed to stay all discovery regarding damages pending resolution of the unlawful detainer case. The Port then filed a motion in the unlawful detainer action for summary adjudication of Syufy's thirteenth affirmative defense, which alleged that OAHC's "deemed rejection" of the Master Lease in the bankruptcy proceedings did not terminate Syufy's rights under the sublease or the Master Lease as a matter of law. The parties understood resolution of this issue could effectively determine the outcome of the unlawful detainer case because the Port stipulated that (1) Syufy had committed no breach of its sublease agreement, and (2) the Port's eviction of Syufy was based solely on its position that the deemed rejection of OAHC's Master Lease in bankruptcy terminated Syufy's rights under the sublease, resulting in a month-to-month tenancy. The municipal court agreed with the Port's position and granted the motion. The parties filed competing motions for summary judgment and, based on its earlier ruling, the court granted the Port's motion, concluding the Port was entitled to regain possession of the premises from Syufy.

Syufy filed a notice of appeal from the unlawful detainer judgment in the Appellate Division of the Alameda County Superior Court (Appellate Division), and the parties agreed to stay proceedings in Syufy's superior court action against the Port pending resolution of the appeal. Syufy also sought a stay of execution of the unlawful detainer judgment, but this request was denied and Syufy surrendered possession of the theater on April 1, 2000. Syufy did not petition the appellate division for writ review of the denial of its motion for a stay, nor did Syufy amend its previously filed appeal to address this issue. In August or September of 2000, while Syufy's appeal was pending, the Port demolished the theater building. Months later, on December 4, 2000, a three-judge panel of the Appellate Division reversed

the entry of summary judgment.[2] The Appellate Division found "Syufy raised a triable issue of material fact as to whether contractual privity created a mutuality of obligations between the [Port] and Syufy" and concluded this factual issue "was not extinguished" by OAHC's deemed rejection of the Master Lease in the bankruptcy court. Upon remand, the Port voluntarily dismissed the case.

The parties then began litigating Syufy's superior court action. Syufy's third amended complaint alleged causes of action for restitution and accounting, inverse condemnation, and breach of contract, based on Syufy's claim that it was a third party beneficiary of the Master Lease as amended by the Fifth Supplemental Agreement. Pursuant to Code of Civil Procedure sections 592 and 597, the Port filed a pretrial motion seeking adjudication of the threshold legal issue of whether Syufy's right to possession of the theater parcel terminated as a matter of law upon the deemed rejection in bankruptcy of OAHC's Master Lease. The trial court decided this issue in the Port's favor and, following Syufy's submission of a written opening statement, granted the Port's motion for nonsuit and dismissed the complaint.

## DISCUSSION

"A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor. [Citation.] 'In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. . . .' [Citation.]" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948].) An appellate court reviewing a judgment of nonsuit is guided by this same rule. "We will not sustain the judgment ' "unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law." ' [Citation.]" (*Ibid.*)

"Where a nonsuit is granted after opening argument, the reviewing court accepts as true the facts asserted in the opening statement and indulges every legitimate inference those facts support. [Citation.]" (*Lombardo v. Huysentruyt* (2001) 91 Cal.App.4th 656, 664 [110 Cal.Rptr.2d 691].)

### I. *Litigation of "Deemed Rejection" Issue Was Not Procedurally Barred*

Syufy initially argues we should not reach the substantive merits of the Port's nonsuit motion because the legal issue of the effect of OAHC's

---

[2]Syufy also appealed the denial of its summary judgment motion; however, the Appellate Division affirmed this ruling.

"deemed rejection" of the Master Lease was previously decided by the Appellate Division in the unlawful detainer case. Thus, Syufy maintains, the trial court erred in allowing the Port to relitigate this issue and in failing to defer to the Appellate Division's earlier decision. In its opening brief on appeal, Syufy did not rely on any particular doctrine of preclusion, but urged us to reverse based on "the concept of judicial finality." (*Lombardo v. Huysentruyt, supra,* 91 Cal.App.4th at p. 676 (conc. opn. of Haerle, J.).) Syufy's reply brief discusses the issue as one of res judicata or collateral estoppel.

■ Collateral estoppel is one aspect of the broader doctrine of res judicata. (*Lockwood v. Superior Court* (1984) 160 Cal.App.3d 667, 671 [206 Cal.Rptr. 785].) "Where res judicata operates to prevent relitigation of a cause of action once adjudicated, collateral estoppel operates (in the second of two actions which do not involve identical causes of action) to obviate the need to relitigate issues already adjudicated in the first action. [Citation.] The purposes of the doctrine are said to be 'to promote judicial economy by minimizing repetitive litigation, to prevent inconsistent judgments which undermine the integrity of the judicial system, [and] to protect against vexatious litigation.' [Citation.]" (*Ibid.*) Because Syufy does not assert the same cause of action adjudicated in the unlawful detainer suit, we are concerned here with collateral estoppel, also referred to as issue preclusion.

■ "The requirements for invoking collateral estoppel are the following: (1) the issue necessarily decided in the previous proceeding is identical to the one that is sought to be relitigated; (2) the previous proceeding terminated with a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party to or in privity with a party in the previous proceeding. [Citation.]" (*Coscia v. McKenna & Cuneo* (2001) 25 Cal.4th 1194, 1201, fn. 1 [108 Cal.Rptr.2d 471, 25 P.3d 670].) The first and third requirements, identity of parties and issues, are satisfied beyond any serious dispute. In deciding whether summary judgment for the Port was proper in the unlawful detainer case, the Appellate Division considered the same legal question presented to the trial judge in the present action—namely, whether the deemed rejection of the Master Lease that resulted from OAHC's bankruptcy extinguished Syufy's right to possession of the theater parcel.[3] The sticking point, for Syufy, is whether "the previous proceeding terminated with a final judgment on the merits . . . ." (*Ibid.*)

---

[3]In its respondent's brief, which addresses only the law of the case doctrine, the Port asserts the Appellate Division did not articulate a "rule of law," but merely determined that issues of material fact precluded the entry of summary judgment. However, this conclusion was based on the court's resolution of the *legal* significance of the deemed rejection of the Master Lease.

After the Appellate Division remanded the unlawful detainer case, the Port voluntarily dismissed the entire action "without prejudice." By definition, a voluntary dismissal without prejudice is not a final judgment on the merits. (*Associated Convalescent Enterprises v. Carl Marks & Co., Inc.* (1973) 33 Cal.App.3d 116, 121 [108 Cal.Rptr. 782]; cf. *Torrey Pines Bank v. Superior Court* (1989) 216 Cal.App.3d 813, 823 [265 Cal.Rptr. 217].) Therefore, we may not accord the Appellate Division's ruling collateral estoppel effect. Perhaps attempting to avoid this result, or to bind the Port to the ruling by the doctrine of retraxit (see *Torrey Pines Bank v. Superior Court*, *supra*, at p. 822), Syufy filed a motion to convert the Port's dismissal into a dismissal "with prejudice." The trial court denied Syufy's motion, and the Appellate Division denied Syufy's petition for review. Although Syufy makes the argument again in this appeal, we agree it has no merit. The Port had a right to dismiss its case without prejudice "at any time before the actual commencement of trial. . . ." (Code Civ. Proc., § 581, subd. (b)(1); see also Code Civ. Proc., § 581, subd. (c).) The voluntary dismissal statute defines commencement of trial as the beginning of opening statement or, absent an opening statement, the administration of an oath or affirmation to the first witness, or the first introduction of evidence. (Code Civ. Proc., § 581, subd. (a)(6).) Clearly, given this statutory definition, trial had not yet commenced. Though the consequences proved unfortunate for Syufy, the Port had a right to dismiss its unlawful detainer action without prejudice.

Nor, as Syufy apparently recognizes, was litigation of the issue precluded under the law of the case doctrine. ■ "Under this doctrine, 'the decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case.' [Citation.]" (*Nally v. Grace Community Church, supra*, 47 Cal.3d at p. 301.) Syufy's breach of contract action is obviously not the "same case" as the unlawful detainer action prosecuted by the Port. Thus, the Appellate Division's unpublished opinion in the Port's case did not establish the law of the case for the matter now under review. (*Nelson v. Justice Court* (1978) 86 Cal.App.3d 64, 66 [150 Cal.Rptr. 39].)

Finally, Syufy urges us to reverse the judgment of nonsuit based on the nebulous "concept of judicial finality." We decline to do so. Although Syufy quotes Justice Haerle's impassioned discussion of this concept in his concurring opinion in *Lombardo v. Huysentruyt, supra*, 91 Cal.App.4th at p. 676 (conc. opn. of Haerle, J.), Syufy refers us to no appellate decision that actually finds a claim or issue precluded on such grounds when the requirements of res judicata or the law of the case doctrine are not met. Moreover, while Justice Haerle criticized the trial court in *Lombardo* for judging

provisions of an earlier probate court order " 'unreasonable,' " Justice Haerle did *not* say this insult to "the spirit, if not the letter, of the concept of judicial finality" (*ibid.*) provided an independent basis for reversing the trial court's judgment.

## II. *Rejection of the Master Lease Terminates Subtenant's Right of Possession*

 Turning now to the substantive issue upon which the trial court granted the Port's motion for nonsuit, we must decide whether subtenant Syufy had a right to remain on the premises despite OAHC's "deemed rejection" of the Master Lease in bankruptcy proceedings. Resolution of this issue depends upon principles of federal bankruptcy law as well as California law.

### A. *Federal Law Regarding Debtor's Rejection of a Lease*

Section 365 of the United States Bankruptcy Code[4] enables the bankruptcy trustee in chapter 11 proceedings to assume or reject any executory contract or unexpired lease held by the debtor. (11 U.S.C. § 365.) However, "if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is lessee within 60 days after the date of the order for relief, . . . then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor." (11 U.S.C. § 365(d)(4).) The parties do not dispute that the OAHC trustee's failure to assume the Master Lease resulted in its deemed rejection. Unquestionably, this event terminated OAHC's right to possession of the property. (*In re Elm Inn, Inc.* (9th Cir. 1991) 942 F.2d 630, 633 ["By operation of law, the debtor's possessory interest in the lease terminated on [the date of rejection], and the lessor's right to immediate surrender of the property simultaneously accrued"].) At issue is the effect of a deemed rejection on third parties with rights derived from or dependent upon a rejected lease.

Federal courts have reached different conclusions on this subject. Observing that 11 United States Code section 365(d)(4) requires a debtor to surrender leased premises to the lessor immediately upon a deemed rejection, some bankruptcy courts have concluded rejection results in a complete termination of the lease. (E.g., *In re 6177 Realty Associates, Inc.* (Bankr. S.D.Fla. 1992) 142 B.R. 1017, 1019.) By extension, these courts have reasoned that rejection of a debtor-lessee's master lease effectively terminates an attached sublease as well, thus extinguishing the subtenant's right to possession of the premises. (See, e.g., *In re Child World, Inc.* (Bankr.

---

[4]All unspecified statutory references are to the United States Bankruptcy Code, title 11 United States Code.

S.D.N.Y. 1993) 161 B.R. 349, 351 [noting "the rejection of the prime lease also results in the rejection of the sublease"]; *Chatlos Systems, Inc. v. Kaplan* (Bankr. D.Del. 1992) 147 B.R. 96, 100 [holding "when a lease is deemed rejected pursuant to § 365(d)(4), any subleases under the primary lease must also be deemed rejected since the sublessee's rights in the property extinguish with those of the sublessor"]; *In re Stalter & Co., Ltd.* (Bankr. E.D.La. 1989) 99 B.R. 327, 331 [concluding, after a sublessor's deemed rejection of the master lease, "there is *no real property to which the subleasehold* attaches as soon as the primary lease is terminated" (italics in original)].) Under this view, i.e., that a deemed rejection "terminates" the master lease and all derivative interests in the property, sublessees would have no right to possession as a matter of federal bankruptcy law.

However, other federal courts "treat a lease rejection as a breach of the lease which does not adjudicate rights of third parties. (*Matter of Austin Development Co.* (5th Cir. 1994) 19 F.3d 1077, 1082; *In re Modern Textile, Inc.* (8th Cir. 1990) 900 F.2d 1184, 1191; *Leasing Serv. Corp. v. First Tenn. Bank Nat. Ass'n* (6th Cir. 1987) 826 F.2d 434, 436-437.)" (*George v. County of San Luis Obispo* (2000) 78 Cal.App.4th 1048, 1053 [93 Cal.Rptr.2d 595].) Since, under this view, the master lease is not automatically terminated, third parties *may* retain a right to assert subservient interests in the lease. (See *Matter of Austin Development Co., supra,* at pp. 1083-1084 [holder of security interest in lease could assert its rights as a third party beneficiary of the lease despite its deemed rejection].) The extent to which a third party's rights in a lease remain intact after the debtor's breach, however, is an issue of state law. (*Id.* at p. 1084.)

The parties have directed us to no cases from the Ninth Circuit Court of Appeals considering the effect of a deemed rejection of a master lease on attached subleases. *In re Elm Inn, Inc., supra,* 942 F.2d at page 633, and *Sea Harvest Corp. v. Riviera Land Co.* (9th Cir. 1989) 868 F.2d 1077, 1080-1081, both reach the unremarkable conclusion that a deemed rejection terminates the *debtor-lessee's* right to possession, but neither of these cases addressed subleases or other third party interests. Though arguably at odds with some "termination" language in these Ninth Circuit Court of Appeals cases, lower federal courts in California and Alaska have begun to adopt the "emerging rule" (see *Vallely Investments v. BancAmerica Commercial Corp.* (2001) 88 Cal.App.4th 816, 829 [106 Cal.Rptr.2d 689]) that a debtor's deemed rejection of a lease constitutes a breach and not a complete termination. (*In re Bergt* (Bankr. D. Alaska 1999) 241 B.R. 17, 25; *In re Locke* (Bankr. C.D.Cal. 1995) 180 B.R. 245, 261; *In re Picnic 'N Chicken, Inc.* (Bankr. S.D.Cal. 1986) 58 B.R. 523, 525.) Once again, however, these cases do not consider the rights of sublessees to continued possession of property after a master

lease has been deemed rejected. Indeed, only *Locke* squarely addresses the effect on third parties of a deemed rejection.[5]

In *Locke*, the lessee of a property assigned 99 percent of its interest to one of the property's tenants and the remaining 1 percent to the Lockes. (*In re Locke, supra,* 180 B.R. at pp. 248-249.) A judgment creditor filed a lien against the Lockes' interest in the lease shortly before the Lockes filed for bankruptcy. (*Ibid.*) Thus, the bankruptcy court had to decide whether a debtor-lessee's deemed rejection of a lease extinguishes a third party's lien against the debtor's interest. After an exhaustive review of federal case law and commentary on the subject, the court concluded the rejection was properly construed as a breach of the lease, not a termination, such that the judgment lien was not automatically extinguished. (*Id.* at p. 263.) In reaching this holding, the court distinguished two cases decided by the Bankruptcy Appellate Panel of the Ninth Circuit because the "crux" of the disputes concerned "the right to possession of the subject premises—not termination or extinguishment of each and every covenant, remedy and right in or appurtenant to the subject lease." (*Id.* at p. 255; see also *id.* at p. 257 [again distinguishing between the debtor's right to possession and "covenants, rights and remedies" related to a lease].)

The current trend in Ninth Circuit bankruptcy cases is apparently to treat a debtor's rejection of a lease as a breach, rather than a termination. (See *Vallely Investments v. BancAmerica Commercial Corp., supra,* 88 Cal.App.4th at pp. 829-830.) Under this "emerging view" (*id.* at p. 829), the Master Lease was not terminated as a matter of law for *all* purposes as a result of OAHC's deemed rejection. Thus, the continuing viability of Syufy's sublease is a question of California law. (*In re Stalter & Co., Ltd., supra,* 99 B.R. at p. 330; *In re Dial-A-Tire, Inc.* (Bankr. W.D.N.Y. 1987) 78 B.R. 13, 16.) This result is consistent with another relevant bankruptcy provision, which provides that when a lease is rejected by a debtor-*lessor*, "the lessee may retain its rights under such lease . . . to the extent that such rights are enforceable under applicable nonbankruptcy law." (11 U.S.C. § 365(h)(1)(A)(ii); see also *In re Dial-A-Tire, Inc., supra,* at p. 16 [noting the

---

[5]In *Bergt*, the debtor had previously granted adjoining landowners a right of first refusal (RFR) in any sale of its property and then sought to reject the RFR under 11 United States Code section 365(d)(4) as an executory contract (thus facilitating sale of the property without honoring the RFR). (*In re Bergt, supra,* 241 B.R. at pp. 18-19.) However, based on its opinion that rejection constitutes breach rather than termination of a contract, the district court concluded the debtor could not avoid the RFR simply by choosing to reject it. (*Id.* at p. 36.) In *Picnic*, the debtor sought to reject a lease so it could cancel a lease-back provision and convey the property unencumbered. (*In re Picnic 'N Chicken, Inc., supra,* 58 B.R. at pp. 524-525.) The court construed the rejection to be a breach, rather than a termination, and observed California law permits a lessor to treat a breached lease as still in effect. (*Id.* at p. 525, citing Civ. Code, § 1951.4.)

"anomalous result" produced by §§ 365(d)(4) and 365(h)(1) that a debtor-sublessor must surrender the premises but its sublessee does not necessarily have to].)

### B. *California Law Regarding Subtenant's Right to Possession*

■ Under California law, a subtenant's rights " 'are dependent upon and subject to the sublessor's rights. . . . [R]ights under the sublease stand or fall with those of the sublessor . . . .' (*Fifth & Broadway Partnership* v. *Kimny, Inc.* (1980) 102 Cal.App.3d 195, 201 [162 Cal.Rptr. 271, 7 A.L.R.4th 580].)" (*Superior Motels, Inc. v. Rinn Motor Hotels, Inc.* (1987) 195 Cal.App.3d 1032, 1065 [241 Cal.Rptr. 487].) "The rights of a subtenant are terminated, and the master landlord is entitled to possession, when the master lease is terminated because of the tenant's default in the performance of his or her obligations." (7 Miller & Starr, Cal. Real Estate (3d ed. 2001) § 19:67, p. 179.) Only when a tenant voluntarily surrenders its estate to the landlord can a subtenant maintain possession. (*Id.* at p. 180; *Northridge Hospital Foundation v. Pic 'N' Save No. 9, Inc.* (1986) 187 Cal.App.3d 1088, 1094-1095 [232 Cal.Rptr. 329].) " 'Thus, if the original tenant has incurred a forfeiture of his lease, and for that reason the landlord annuls the lease, the landlord is entitled to the possession as against the sublessee.' " (*Herman v. Campbell* (1948) 86 Cal.App.2d 762, 766 [195 P.2d 801].)

In *Ilkhchooyi v. Best* (1995) 37 Cal.App.4th 395 [45 Cal.Rptr.2d 766], Division Three of the Fourth District Court of Appeal addressed the same question we now face regarding the rights of a subtenant following the sublessor's deemed rejection of a lease. Westar Management Co. (Westar) leased a commercial space to two couples (both named Rosenblatt) who opened a drycleaning business. (*Id.* at p. 400.) The Rosenblatts later subleased the premises to Ilkhchooyi and his partner. The sublease, which was approved by lessor Westar, stated it would terminate if the lease terminated for any reason. (*Ibid.*) One of the Rosenblatt couples later filed a bankruptcy petition (*ibid.*), and the lease with Westar was deemed rejected pursuant to 11 United States Code section 365(d)(4). (*Ilkhchooyi v. Best, supra,* at p. 404.) Relying on the traditional view of federal bankruptcy cases *Chatlos Systems, Inc. v. Kaplan, supra,* 147 B.R. 96, and *In re Stalter & Co., Ltd., supra,* 99 B.R. 327, the court stated: "Once the lease is rejected in bankruptcy, it is terminated as to all parties, including those with an interest derived from the bankrupt. [Citations.]" (*Ilkhchooyi v. Best, supra,* at p. 404; see also *366-388 Geary St., L.P. v. Superior Court* (1990) 219 Cal.App.3d 1186, 1197-1198 [268 Cal.Rptr. 678] [holding a security interest in a lease was "extinguished" when the lease was rejected in bankruptcy].) Thus, the court concluded the lease and Ilkhchooyi's sublease "were terminated by

operation of law due to the bankruptcy of the Rosenblatts." (*Ilkhchooyi v. Best, supra,* at p. 404.)[6]

Syufy attempts to distinguish this holding, and the general principle that forfeiture of the master estate terminates the derivative interest of a sublessee (see *Superior Motels, Inc. v. Rinn Motor Hotels, Inc., supra,* 195 Cal.App.3d at p. 1064), by arguing it was more than an ordinary sublessee. Based on two mentions of Syufy in the Fifth Supplemental Agreement to the Master Lease and Syufy's promise, in the sublease, to assume the obligations of the Master Lease, Syufy contends it was a third party beneficiary of the Master Lease. Because, as a third party beneficiary, Syufy enjoyed "direct" contractual privity with the Port, Syufy insists its rights were not merely derivative of the rights of its sublessor, OAHC, but were directly connected to the Port's reversionary estate. Thus, Syufy concludes the severing of contractual privity between the Port and OAHC did not impair Syufy's third party beneficiary rights under the Fifth Supplemental Agreement to the Master Lease.

Syufy's argument relies heavily on *Vallely Investments v. BancAmerica Commercial Corp., supra,* 88 Cal.App.4th 816. This case arose from a complicated series of transactions. The lessor, Vallely Investments, L.P. (Vallely), leased a parcel of land to Balboa Landing, L.P. (Balboa). (*Id.* at p. 819.) Balboa mortgaged the property, with a loan secured by a deed of trust on the lease, and later defaulted. Balboa then filed for bankruptcy protection. (*Id.* at p. 820.) As an alternative to a traditional foreclosure, Balboa agreed to assign its lease to BACC, a wholly owned subsidiary of the lender bank. In the assignment, BACC agreed to assume all covenants and obligations of the lease. (*Ibid.*) The bank then obtained the lease at a foreclosure sale and eventually sold it to Edgewater Place, Inc. (Edgewater). (*Ibid.*) After Edgewater failed to pay rent and Vallely sued, Edgewater filed chapter 11 bankruptcy and rejected the lease. (*Id.* at p. 821.) Vallely, having only recently learned of the assignment from Balboa to BACC, sued BACC for the past due rent. (*Ibid.*) Among other arguments, BACC asserted Edgewater's rejection of the lease in bankruptcy terminated the lease as to all parties. (*Id.* at p. 828.) The appellate court rejected this argument, and distinguished California cases holding certain lease interests terminated due to the tenant's bankruptcy, because it concluded Vallely's contract rights did not depend upon the validity of the lease. (*Id.* at pp. 828-829.) Because

---

[6]Syufy sought to distinguish *Ilkhchooyi* below based on a provision in the Westar lease that permitted the landlord to terminate possession in the event of the tenant's bankruptcy. (*Ilkhchooyi v. Best, supra,* 37 Cal.App.4th at p. 404.) Syufy does not repeat this argument on appeal, and it is just as well, since the Master Lease contained a similar provision allowing the Port to terminate the lease in the event the lessee lost possession due to bankruptcy or insolvency.

BACC specifically assumed the lease obligations in its assignment agreement, Vallely's contract rights against BACC were not derivative of or dependent upon the ground lease, and therefore rejection of the lease by a subsequent lessee in bankruptcy did not exonerate the surety BACC of its contractual obligations. (*Id.* at p. 830.)

Syufy likens itself to Vallely, insisting they are both third party beneficiaries whose rights cannot be extinguished by termination of a lease. Yet this argument begs the question: third party beneficiaries of what? As lessor, Vallely was an intended beneficiary of the *assignment* contract in which BACC agreed to assume all contractual obligations of a lease, even though it appears BACC never actually took possession of the property as lessee. (*Vallely Investments v. BancAmerica Commercial Corp., supra,* 88 Cal.App.4th at p. 820.)[7] The *Vallely* court concluded BACC's promise—made in a separate contract from the lease—gave the lessor contract rights that "[did] not depend upon the validity of the lease." (*Vallely,* at p. 829.) Thus, the court expressly distinguished *Ilkhchooyi v. Best* and *366-388 Geary St., L.P. v. Superior Court* because "Vallely is not claiming any rights under the lease that was rejected." (*Ibid.*) In contrast, Syufy's asserted right to possession is based *entirely* on the Master Lease and its derivative sublease. There is no separate contract for Syufy to enforce. Although Syufy stresses the importance of its mention, by name, in the Fifth Supplemental Agreement, by its own terms this agreement was merely an amendment to the Master Lease.

*Vallely* is distinguishable for another reason. The third party beneficiary Vallely sought to enforce a contractual right to rent due under a lease. (*Vallely Investments v. BancAmerica Commercial Corp., supra,* 88 Cal.App.4th at pp. 821, 830.) There was no dispute about a party's right to possession of the leased premises. This distinction is important. "A lease of real property is both a conveyance of an estate in land (a leasehold) and a contract. It gives rise to two sets of rights and obligations—those arising by virtue of the transfer of an estate in land to the tenant (privity of estate), and those existing by virtue of the parties' express agreements in the lease (privity of contract). [Citation.]" (*Id.* at p. 822.) A subtenant generally has neither privity of estate nor privity of contract with the original lessor. (See *id.* at p. 823.) Although a subtenant who expressly assumes obligations of the primary lease may come into privity of contract with the landlord (see *ibid.* [dictum]; *Marchese v. Standard Realty & Dev. Co.* (1977) 74 Cal.App.3d 142, 147 [141 Cal.Rptr. 370]), "the privity of estate remains between the landlord and the tenant-sublessor." (7 Miller & Starr, Cal. Real

[7]BACC merely managed the property pending its foreclosure. (*Vallely Investments v. BancAmerica Commercial Corp., supra,* 88 Cal.App.4th at p. 820.)

Estate, *supra*, § 19:60, p. 162; see also *id.* at § 19:68, p. 183 [since no tenancy relationship exists between a master landlord and subtenant, there is no privity of estate between them].)

 Because rejection of a lease in bankruptcy terminates a debtor-tenant's right to possession of the property (11 U.S.C. § 365(d)(4) [bankruptcy trustee must "immediately surrender" leased property to the lessor]), this event also terminates the privity of estate between the landlord and tenant. In this case, when the Master Lease was deemed rejected, privity of estate between the Port and OAHC ended and the Port had an unconditional right under section 365(d)(4) to regain possession of the entire leased premises—which included Syufy's theater parcel (as provided in the Fifth Supplemental Agreement). It is difficult to reconcile the Port's clear right to surrender of the premises with Syufy's claim to continued possession as a third party beneficiary of a defunct lease. Syufy has not cited, nor have we found, any published case holding a subtenant retains a right of possession in these circumstances.

In the trial court, Syufy relied on *Chumash Hill Properties, Inc. v. Peram* (1995) 39 Cal.App.4th 1226 [46 Cal.Rptr.2d 366]. *Chumash*, however, does not help Syufy. In *Chumash*, the primary lease specified that in the event of a bankruptcy by the lessee, a subtenant's use and possession of the property would not be disturbed so long as the subtenant complied with all sublease provisions. (*Id.* at p. 1229.) Because the court found subtenant Chumash was a third party beneficiary of this nondisturbance agreement, it concluded Chumash's right to possession under the sublease was not terminated by the lessee-sublessor's bankruptcy. (*Ibid.*) The Master Lease in this case included no such nondisturbance provision. Nowhere in the Master Lease or the Fifth Supplemental Agreement did the Port promise to allow Syufy, or any sublessee, to remain in possession of the leased premises even after defaults by the lessee resulted in termination of the primary lease. Nor did Syufy agree to accept the Port as its new landlord in case of a default by the sublessor. " '[A nondisturbance] agreement ordinarily will require performance of obligations by both parties. The prime lessor will be required to recognize the sublease and to accept the sublessee as the tenant of the prime lessor, and the sublessee will be required to attorn to the prime lessor. . . .' [Citation.]" ██ (*Chumash*, at p. 1233.)[8]

Because this case primarily concerns Syufy's right to possession of the leased premises, *George v. County of San Luis Obispo, supra,* 78 Cal.App.4th

---

[8] " '[A]ttornment' is an old word with a simple modern meaning: The tenant has agreed, or will agree, to recognize his landlord's successor in interest as his new landlord. [Citation.]" (*Vallely Investments v. BancAmerica Commercial Corp., supra,* 88 Cal.App.4th at p. 824, fn. 3.)

1048 is instructive. In *George*, lessees of a nonresidential property filed for bankruptcy and their lease was deemed rejected under section 365(d)(4). (*George*, at pp. 1050, 1052.) The bankruptcy court issued an order requiring the debtors " 'and anyone claiming possession under or through them who had notice of these proceedings . . .' " to surrender the property immediately to the City of Morro Bay (presumably the landlord). (*Id.* at p. 1050.) Three individuals, who were not the debtors but were in possession of the property and forcibly removed, sued local law enforcement officials for wrongful eviction. (*Ibid.*) They argued "that, even if the bankruptcy court may compel surrender of leased premises by the bankrupt, it does not follow that the bankruptcy court may compel surrender by third persons claiming an interest in the lease—namely, themselves." (*Id.* at p. 1053.) The Court of Appeal rejected this argument, finding the bankruptcy court's order consistent with Ninth Circuit case law. (*Ibid.*)

Syufy would distinguish *George* because the bankruptcy order specifically ordered surrender of the premises by persons claiming possession "under or through" the debtors, and the third parties in *George* had notice of the bankruptcy proceedings whereas Syufy did not. But these are distinctions without a meaningful difference as far as Syufy's right to maintain its subtenancy is concerned. Syufy, like the Georges, is a third party claiming a right to possession derived from a master lease that was terminated—if not automatically, as a matter of federal bankruptcy law, then pursuant to paragraph 10 of the Master Lease, which gave the Port an option to terminate in the event of the lessee's bankruptcy. ▮ Given the absence of California case law permitting continued possession by a subtenant after rejection of the master lease in bankruptcy, and given the Port's contractual right to terminate the Master Lease, the trial court correctly determined Syufy had no right to continue in possession of the theater parcel following OAHC's deemed rejection of the Master Lease.

C. *Syufy Has No Right to Possession as a Third Party Beneficiary*

In a related argument, Syufy claims its third party beneficiary rights under the Master Lease must be enforced—even if the lease is considered terminated—because the lease contract was never rescinded. Generally, "[a] contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." (Civ. Code, § 1559.) Syufy interprets this principle to mean that a third party beneficiary's rights survive a termination of the underlying contract, so long as the parties never formally rescinded the agreement. Syufy draws support from a broad statement taken out of context from *Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman* (1998) 65 Cal.App.4th 1469, 1486 [77 Cal.Rptr.2d

479] (*Principal*), wherein the court stated: "If rescission has not occurred according to the statutory procedures, but the contract is instead terminated for some other reason, a third party beneficiary may still enforce the agreement." Considering this sentence in light of the entire decision, we conclude *Principal* does not support Syufy's position.

The lease at issue in *Principal* included an attornment clause, "which stated that if the landlord sold the building or lost it in foreclosure, the tenant would attorn to the landlord's successor in interest upon request, and be bound by a new lease on the same terms as the old one. [Fn. omitted.]" (*Principal, supra,* 65 Cal.App.4th at p. 1475.) A lender that held a deed of trust on the lease eventually foreclosed, acquired title to the building, and expected the tenant (a law firm) to remain in occupancy pursuant to the attornment clause. (*Id.* at p. 1476.) However, the law firm contended the foreclosure extinguished the lease, leaving it a month-to-month tenant. (*Ibid.*) When the firm vacated its office, the lender sued. While the appellate court agreed that foreclosure extinguished the lease, it held the lender could nevertheless enforce the attornment clause as a third party beneficiary. (*Id.* at p. 1485-1486.) The court emphasized the attornment provision was specifically designed to take effect upon foreclosure; thus, if foreclosure extinguished the tenant's obligation, the attornment clause would be rendered meaningless. (*Id.* at p. 1487.)

In contrast, Syufy identifies no provision specifically designed to take effect—and to benefit subtenant Syufy—upon termination of the Master Lease. In the Fifth Supplemental Agreement, the Port agreed to lease an additional parcel of land to the lessee (a predecessor of OAHC) for the construction of a movie theater, and the parties merely stated their understanding that Syufy would construct the theater and the lessee "may" sublease the parcel to Syufy. This agreement does not purport to give Syufy any right surviving termination of the Master Lease.

But the main problem with Syufy's argument derives from the rule that "[a] third-party beneficiary cannot assert greater rights than those of the promisee under the contract. [Citation.] Because the foundation of any right the third person may have is the promisor's contract, '[w]hen [a] plaintiff seeks to secure benefits under a contract as to which he is a third-party beneficiary, he must take that contract as he finds it. . . . [T]he third party cannot select the parts favorable to him and reject those unfavorable to him.' [Citation.]" (*Marina Tenants Assn. v. Deauville Marina Development Co.* (1986) 181 Cal.App.3d 122, 132 [226 Cal.Rptr. 321].) While Syufy may be considered a third party beneficiary of certain provisions in the Fifth Supplemental Agreement, i.e., those which anticipate

Syufy would become a subtenant of the theater parcel, the agreement does not give Syufy a greater right to remain in possession of the property than was enjoyed by the lessee, OAHC.

## III. *Syufy's Remaining Arguments Do Not Warrant Reversal*

### A. *Due Process*

Syufy received no notice of OAHC's bankruptcy proceedings until after the Master Lease was deemed rejected. Syufy argues this deemed rejection cannot be construed as automatically terminating Syufy's right to possession as a sublessee because such a construction would violate Syufy's due process and statutory rights to receive notice of a default and the opportunity to cure it. (Code Civ. Proc., § 1161.) But the Port had no obligation to inform Syufy about the lessee's bankruptcy. Moreover, Syufy conveniently ignores the fact that it *did* receive notice almost a year before OAHC's bankruptcy estate closed. On August 10, 1994, the Port sent Syufy a letter explaining that a United States Bankruptcy Court had ordered OAHC to vacate the hotel premises and stating: "As a result of the court's orders, the lease between the Port and the Hotel has been terminated. In addition, as Syufy is a subtenant under the Hotel lease, the court's orders effectively terminates [*sic*] Syufy Enterprise's sublease with the hotel." Syufy did not petition the bankruptcy court for an order protecting its right to possession, nor did Syufy negotiate a new lease with the Port. Because it appears from the undisputed facts that Syufy had adequate notice and opportunity but failed to protect its rights, Syufy's due process argument has no merit.

### B. *Inverse Condemnation*

Syufy's third amended complaint alleged a claim for inverse condemnation, on the theory that the Port's entry onto the premises and demolition of the theater, done in furtherance of the Port's intended redevelopment of the area, constituted a governmental taking of private property for public use. (See Cal. Const., art. I, § 19 ["Private property may be taken or damaged for public use only when just compensation . . . has first been paid to . . . the owner"].) Because the trial court correctly concluded the Port had a right to regain possession of the entire leased premises, due to the rejection of the Master Lease, there was no "taking," and Syufy's inverse condemnation claim fails as a matter of law.

### C. *Estoppel*

Finally, Syufy contends its affirmative defenses of waiver and estoppel (raised in Syufy's answer to the Port's cross-complaint) raise

factual issues precluding an entry of nonsuit. Syufy claims its opening statement set forth sufficient facts to show the Port misled Syufy to believe it could remain in possession of the theater premises throughout the original term of the Master Lease. ▇▇ Normally, "[t]he presence of estoppel is a question of fact to be pleaded and proved. [Citations.]" (*Aetna Casualty & Surety Co. v. Humboldt Loaders, Inc.* (1988) 202 Cal.App.3d 921, 930 [249 Cal.Rptr. 175].) However, even accepting all Syufy's alleged facts as true, and giving Syufy the benefit of all inferences in its favor, we conclude they do not support a finding of waiver or estoppel.

In August 1994, after OAHC failed to assume the Master Lease in its bankruptcy proceedings, the Port immediately sent Syufy a letter stating that this lease and Syufy's sublease were "terminated" as a result of the bankruptcy court's orders. The letter informed Syufy that the board of port commissioners had approved a resolution to allow Syufy to continue occupying the premises "on a month-to-month basis" and asked Syufy to sign and return the letter if it agreed to proceed with such a month-to-month agreement. Syufy's written opening statement describes the company's response. Upon receiving this letter, Syufy contacted the Port and was told "the Port did not intend to disturb SYUFY's tenancy on the site, and further, that the Port desired to formalize the relationship between SYUFY and the PORT with respect to the theater parcel in a new lease signed by both SYUFY and the PORT." During a meeting on August 24, 1994, a representative of the Port told Syufy: "the PORT intended to continue its relationship with SYUFY at the site based on the terms and conditions of the existing Fifth Supplemental Agreement and Agreement of Sublease . . ." and "the PORT desired to enter into a new, direct lease with SYUFY for a term through at least June 30, 2010, and potentially longer." In reliance on these representations, Syufy signed the Port's letter. At the August 24 meeting, Syufy's representative told the Port Syufy believed it had a right to remain on the property under the Fifth Supplemental Agreement and the sublease and intended to remain. Syufy also asked the Port to enforce terms of the Master Lease against the previous hotel tenant, but the Port explained this would not be necessary because the Port intended to take over operation of the hotel. Syufy and the Port discussed the possibility of entering a longer lease (beyond June 2010) and agreed to negotiate. The parties continued to discuss this idea in later meetings, with a representative of the Port indicating at least once that a longer lease "would likely be acceptable" to the Port, but they never prepared or executed such a lease.

These facts, as alleged by Syufy, do not support a finding of waiver or estoppel. ▇▇ "Waiver is the intentional relinquishment of a known right." (11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 178,

pp. 860-861, italics omitted.) ■ None of these facts suggest the Port ever intended to relinquish its right to retake possession of the property. The Port's discussions with Syufy after OAHC's bankruptcy merely amount to negotiations of a possible new lease. While the Port assured Syufy it did not intend to disturb Syufy's tenancy, the Port clearly explained in its August 24, 1994 letter it considered that tenancy to be of a month-to-month nature. Moreover, although Syufy expressed its belief that it had greater rights, there is no indication the Port acquiesced in Syufy's view or misled Syufy into believing it could continue in possession under the sublease. On the contrary, the Port urged Syufy to enter a new, direct lease, and Syufy took steps to do so.

■ The facts are also inconsistent with an estoppel. " 'The essence of an estoppel . . . is that the party to be estopped has by false language or conduct led another to do that which he would not otherwise have done and as a result thereof that he has suffered injury. [Citations.]' " (*Hair v. State of California* (1991) 2 Cal.App.4th 321, 328-329 [2 Cal.Rptr.2d 871].) The Port stated its view clearly, and in writing, that the lease and sublease were terminated as a result of OAHC's bankruptcy, and the Port encouraged Syufy to enter a new lease. These facts do not indicate false statements upon which Syufy detrimentally relied. Nor does the Port's failure to notify Syufy of OAHC's bankruptcy proceedings before the Master Lease was deemed rejected give rise to an estoppel, since the Port had no contractual or legal duty to give Syufy notice of these proceedings. When Syufy learned in August 1994 that the Master Lease had been terminated pursuant to orders of the bankruptcy court, Syufy could have petitioned the bankruptcy court for relief or negotiated a new direct lease with the Port to secure its right to continue in possession of the property. Syufy alleged no facts indicating the Port misled Syufy into abandoning these options.

DISPOSITION

The judgment is affirmed. Syufy shall bear costs of the appeal.

Corrigan, Acting P. J., concurred.

**POLLAK, J.**—I concur in the thorough and thoughtful majority opinion, but wish to express a single caveat, with respect to the reason for which the decision of the Appellate Division of the Alameda County Superior Court in the prior unlawful detainer action is not conclusive in this litigation. The majority undoubtedly is correct that, under current authority, the voluntary dismissal of that case deprived the decision of the appellate division of finality for the purpose of applying collateral estoppel. Yet, in my view,

there is much to be said for the sentiment expressed in Justice Haerle's concurrence in *Lombardo v. Huysentruyt* (2001) 91 Cal.App.4th 656, 676 [110 Cal.Rptr.2d 691], suggesting the appropriateness of expanding the concept of judicial finality to encompass situations that come within the spirit, if not the current letter, of this concept. Had the appellate division rendered a decision unequivocally determining the legal consequences of the deemed rejection of the "Master Lease" to the parties in this case, there would be good reason to conclude that the Port of Oakland did not preserve the ability to relitigate this issue in another case by the expedient of dismissing the unlawful detainer action before there was an opportunity to enter a final judgment. But in my view, the decision of the appellate division did not constitute such an unequivocal determination. All that the appellate division decided was that the consequences of the deemed rejection could not be summarily adjudicated because there were several triable issues of material fact, including "[w]hether contractual privity arose between the Port and Syufy based upon the intent of the parties as reflected in the terms of the Sublease and Fifth Amendment to the Master Lease." Because the appellate division decided only that factual issues remained for resolution, the decision cannot form the basis for a collateral estoppel predicated on the manner in which those issues would have been resolved if the litigation had proceeded to its conclusion.

A petition for a rehearing was denied January 21, 2003, and appellant's petition for review by the Supreme Court was denied March 19, 2003.