Filed 5/30/13  Adam v. Adam CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.111.5.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| THOMAS G. ADAM et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>ANDREW M. ADAM,<br><br>    Defendant and Respondent. | 2d Civil No. B237557<br>(Super. Ct. No. 1272918)<br>(Santa Barbara County) |

Appellants Thomas G. Adam and his wife Janice Adam[1] appeal from a declaratory relief judgment arising from Andrew M. Adam's (Thomas's brother) sale and leaseback of a 321-acre ranch.  Thomas argues, among other things, that the trial court erred in finding that Andrew breached no fiduciary duty and was not required to provide a more detailed accounting.  We affirm.

*The Family Ranches*

In 1990, Thomas's and Andrew's father, William P. Adam, Jr. (Bill), owned the 321-acre Union Sugar Ranch (USR) and 134-acre Main Street Ranch in

---

[1] We refer to appellants as Thomas and refer to other family members by their first names for the convenience of the reader.

Santa Maria.  Due to financial problems, Bill had to file a Chapter 11 bankruptcy and wanted to keep the ranches in the family.  With the bankruptcy court's approval, Andrew purchased USR and Main Street Ranch by paying $100,000, forgiving a $157,500 debt, paying Bill's vendors, and executing a $3.462 million all-inclusive note (AIN) naming Bill and Georgiana Adam (Thomas's and Andrew's mother) as payees.  The AIN provided that Andrew would make payments on three loans (underlying obligations) encumbering both ranches.

In order to finance the purchase, Andrew kept Main Street Ranch and sold USR to his brothers, Thomas and William O. Adam, III (William), pursuant to a sale and leaseback agreement.  Thomas and William executed a $3.557 million AIN and trust deed to pay principal and interest in the amounts and times called for in the underlying obligations (i.e., the three ranch loans and Bill's $3.462 million AIN).  The 20-year lease provided that Andrew would rent the farmable portion of USR for $224,700 a year,  that the rent was insufficient to service the underlying obligations, and that William and Thomas would have to advance money to avoid a default.  By the end of 1993, the default amount was almost $300,000.

*Loan Workout Agreement*

The family attorney, Maurice Twitchell, corresponded with the brothers and drafted a 1994 loan workout agreement entitled:  "Agreement for Curing of Default and Payment of Note" (ACD) and "Renegotiated Farm Lease" (RFL).  The ACD stated that Andrew had paid all the rent and advanced $557,977.87 to cure the defaults on the underlying obligations.  It further stated that William and Thomas had not paid property taxes and were in default on Andrew's AIN and trust deed.

The RFL was for a 26-year lease term (November 1, 1994 to October 31, 2020)  and provided that Andrew would sublease USR and pay rent equal to the subrents received, less any amount paid for property taxes, repairs, and maintenance of

wells/pumps and other improvements (i.e., the "Basic Rental").[2] The RFL stated that William and Thomas "irrevocably authorizes and directs Tenant [Andrew] to pay such basic rent directly to the financial institutions described in said all inclusive deed of trust until such obligations shall be paid in full. Any amounts of basic rent in excess of the amounts needed to pay said underlying obligations shall be retained by Tenant as reimbursement for his prior advances in accordance with that certain 'Agreement for Curing of Default and Payment of Note' between the parties signed concurrently herewith."

The ACD incorporated the RFL and acknowledged that the rents were not sufficient to pay the underlying obligations, that advances would have to be made to avoid a loan default/foreclosure, and that Andrew has "the legal right, but not the obligation, to advance funds to pay the portions of the underlying obligations not paid for by the subrents, which advances are added to and become payable to [Andrew] under the terms of said all inclusive trust deed note."

Over the next 10 years, Andrew used all the rents to make payments on the underlying obligations and advanced more than $1 million to avoid a loan default and foreclosure. On August 11, 2006, Andrew refinanced Main Street Ranch, paid off the underlying obligations, and kept the USR rents. The RFL stated that, commencing November 1, 2016, Andrew would share the rents with Thomas and William until the RFL expired on October 31, 2020.

*The Complaint*

Thomas demanded an accounting and filed a complaint on October 24, 2008, for breach of contract, rescission, breach of fiduciary duty, accounting, and declaratory relief. The complaint prayed that "[Andrew] Adam's estate in the Union

---

[2] The RFL states that Andrew is leasing 310 acres. The remaining 11 acres is either nonfarmable or used by William and Thomas to store equipment and materials for their construction business.

Sugar Ranch be destroyed. . . ."  At trial, Thomas claimed that Andrew only advanced $64,000 to cure the loan default  rather than $557,977.87, and that Andrew breached a fiduciary duty by not accounting for rents.

The trial court found that Andrew breached no fiduciary duty and that the rescission cause of action was time barred.  (Code Civ. Proc., § 337, subd. 3.)  The court reopened the trial to receive expert testimony on the August 11, 2006 payoff amount, i.e., the amount advanced by Andrew to pay off the underlying obligations.  Adopting the calculations of Andrew's expert, the court found that the payoff amount was $4,498,189.

Judgment was entered with findings that Andrew did not materially breach the contracts or breach any fiduciary duty, that Thomas suffered no damages, and that Andrew is entitled to all the USR rents through October 31, 2016.  Commencing November 1, 2016, Andrew will split the net rental income with Thomas and William until October 31, 2020, when the RFL expires.   The judgment states that Thomas and William can terminate the RFL at any time by selling the USR and paying Andrew $4,498,189 (the August 11, 2006 payoff amount) plus eight percent simple interest.

*Fiduciary Duty*

Thomas argues that Andrew breached a fiduciary duty to make a full disclosure of the subleases and rents, provide regular accountings, and disclose what advances were made to pay off the underlying obligations.  The trial court found that insufficient evidence was presented to show damages or the breach of any fiduciary breach.

Because Thomas had the burden of proof at trial, the question on appeal is whether the evidence compels a finding in favor of Thomas as a matter of law.  (*Roesch v. De Mota* (1944) 24 Cal.2d 563, 570-571.)  It is a daunting standard on review.  A defense judgment based on failure of proof will be upheld unless the plaintiff's evidence is "uncontradicted and unimpeached," and "of such a character and

4

weight as to leave no room for a judicial determination that it is insufficient to support a finding . . . ." (*Id.*, at p. 571.) Thomas does not meet that standard.

The RFL states that "[t]he relationship between the parties is that of landlord and tenant, and not partners or joint venturers." A landlord and tenant relationship does not create a fiduciary duty. (*Girard v. Delta Towers Joint Ventura* (1993) 20 Cal.App.4th 1741, 1749.) Andrew assumed a lender and borrower relationship with Thomas but "[t]he relation between a mortgagee and mortgagor is not fiduciary. [Citation.]" (*Lineker v. McColgan* (1921) 54 Cal.App. 771, 774 [mortgagee in possession].) Where no negligence or improper conduct is alleged, a mortgagee in possession is only chargeable with what he actually received, and no more. (*Murdock v. Clarke* (1891) 90 Cal. 427, 438; Miller & Starr, Cal. Real Estate (3d ed 2011) § 10:46, p. 150.) The trial court correctly found no breach of fiduciary duty and that it was an arm's length transaction. (See, e.g., *Oaks Management Corp. v. Superior Court* (2006) 145 Cal.App.4th 453, 466; *Bastajian v. Brown* (1943) 57 Cal.App.2d 910, 915.)

*$557,977.87 Default Amount*

Thomas claims that the $557,977.87 default amount was written into the ACD after he signed it in 1994. The trial court credited Andrew's testimony that the default amount was set forth in the ACD when it was signed. The evidence shows Thomas was aware of the $557,977.87 default amount and did not object until 2008 when he filed the complaint, rendering the rescission claim time-barred. (Code Civ. Proc., § 337, subd. 3.) Although Thomas claims that $557,977.87 is too much, the trial court found that it is the exact number, to the penny listed in a ledger maintained by Thomas's and Andrew's mother, Georgiana. Andrew made additional advances after the ACD was signed "by refinancing the debts, paying the obligations that were secured by Union Sugar [R]anch and placing the liens against his own property. This was something that no party anticipated and which the agreement fails to directly address."

5

The ACD gave Andrew the legal right but not the obligation to pay the underlying obligations in advance.[3] Exercising that right, Andrew paid all the property taxes and paid off the underlying obligations so that he could enjoy future USR rental income. The trial court found that it "was an entirely voluntary act . . . to go ahead and pay off the loans. . . . Is that a bad thing for Andrew to do? Not necessarily. It might be a perfectly sound business decision to make . . . ."

At the hearing on a motion for new trial, Thomas's counsel conceded that "[w]e were never seeking damages from the defendant. . . . [W]e did think there was a breach of contract. We wanted to control it, but [Andrew] would still get the same money he's going to get now." If no damages were suffered or are being sought, the action for breach of contract, failure to disclose, and breach of fiduciary duty fails as a matter of law. (See *Bramalea California, Inc. v. Reliable Interiors, Inc.* (2004) 119 Cal.App.4th 468, 473; *Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1086.)

*Regular Accountings*

Thomas argues that he is entitled to "regular accountings, and a court order requiring Andrew to do so." But that is what Thomas got. Andrew's expert, Thomas Rust, provided an accounting. Thomas's accountant, Mike Radakovich, reviewed the loan records, ledgers, lease agreements, rent records, and accounting prepared by Andrew's and Thomas's mother, Georgiana Adam, and declared that he had enough information to calculate the payoff amount.

---

[3] Thomas argues that interpretation of the ACD and RFL is a question of law subject to de novo review on appeal. (See *WYDA Associates v. Merner* (1996) 42 Cal.App.4th 1702, 1710.) Thomas, however, claimed that the ACD and RFL were ambiguous and introduced parol evidence. Where here, the extrinsic evidence is in conflict, we will uphold any reasonable interpretation of the contract that is supported by substantial evidence. (*Ibid.*) "Even in cases where the evidence is undisputed or uncontradicted, if two or more different inferences can reasonably be drawn from the evidence this court is without power to substitute its own inferences or deductions for those of the trier of fact . . . ." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.)

6

Thomas is dissatisfied with the accuracy of the accounting but it was his own doing. (Civ. Code, § 3517 ["No one can take advantage of his own wrong"].) The trial court found: "The simple fact is that the parties entered into a sale and lease agreement which resulted in claims and counter claims against each other based on failures to make payments, failures to account for rents, and other assorted claims. Rather than rely on accountants, the parties kept their own ledgers maintained by their mother, Georgiana. Forensic accountants attempted to reconcile financial information from the ledger, but were unable to agree."

Thomas claims that the trial court erred in not ordering future accountings but that was ordered, too. The judgment states that Andrew is "to provide yearly accountings along with the leases to plaintiff regarding monies they are receiving for the rent."

*Payoff Amount if Thomas Cancels the RFL*

At Thomas's request, the trial court reopened the trial to determine the August 11, 2006 payoff amount should Thomas cancel the RFL before it expires on October 31, 2020. The court stated: "The starting point is the original amount advanced, $577,977.87, plus any additional advances after the date of the Agreement [for Curing] Default and Renegotiated Farm Lease plus 'simple interest on such advances at the rate of eight percent per annum' less any reimbursement received by Andrew from net rental income."

The trial court determined that the $4,498,189 payoff amount calculated by Andrew's expert (Thomas Rust) was more accurate than the $4,022.218 calculation by Thomas's expert (Mike Radakovich). We are precluded from reweighing the evidence. (*Berniker v. Berniker* (1947) 30 Cal.2d 439, 444.) An accounting was ordered. Accounts were rendered. Objections were filed and heard, and the trial court determined that the payoff amount was $4,498,189. There was no miscarriage of justice nor is Thomas entitled to a new accounting. (See, e.g., *Sears v. Rule* (1945) 27 Cal.2d 131, 149; *Douglas v. Westfall* (1952) 113 Cal.App.2d 107, 114.)

7

*Eight Percent Interest on Andrew's Advances*

Thomas argues that the trial court erred in finding that he must pay $4,498,189 plus 8 percent simple interest if Thomas cancels the RFL by selling the property. Paragraph 23 of the RFL, entitled "<u>Cancellation Clause</u>," states: "Landlord [i.e., Thomas] shall have the right, upon written notice to Tenant, to cancel this [lease] at such time as all of the underlying obligations, as defined above, have been paid in full and Tenant has been reimbursed in full for all advances that Tenant has made towards payment of the underlying obligations, together with simple interest on such advances at the rate of eight percent per annum." At trial, Thomas admitted there were discussions about "breaking the lease" and agreed that Andrew would be "paid back for any advances" and "we also pay him eight percent on those advances . . . ."

The eight percent interest charge is consistent with the ACD which acknowledges that advances had to be made to save the ranches. Thomas's and William's initial investment was less than $55,000, they paid no property taxes or loan payments after the ACD was signed, and they own USR which is now worth more than $19 million. Andrew's refinancing and early payoff of the underlying obligations was unexpected but saved William and Thomas more than $1 million in loan interest. In the words of William, co-owner of USR , it was "the best investment [Thomas] and I ever made in our life." On the first day of trial, Thomas's attorney agreed that Andrew should be paid for his advances, "[p]lus, if we cancel this lease, we would even say that he would be entitled to interest on that . . . I think in fairness we would give [him] that eight percent." There are no grounds in law or equity to rewrite the sale and leaseback agreement to make it more profitable for Thomas.

*Sale of USR as Condition Precedent to Cancellation of RFL*

Thomas argues that the trial court erred in finding that the sale of USR is a condition precedent to cancellation of the RFL. The ACD and RFL incorporate each other and must be read together in determining the parties' respective rights. (Civ. Code, § 1642; *Harm v. Frasher* (1960) 181 Cal.App.2d 405, 412-413.) Paragraph 4 of the ACD states: "Despite any provision in this agreement to the contrary, it is agreed

8

that [William] and [Thomas] may cancel the renegotiated farm lease *at any time that they wish to sell the property*, in which case the following agreements shall apply: [¶] . . . [¶]  B.  All amounts advanced by [Andrew] towards payment of the underlying obligations or taxes on the Union Sugar [R]anch shall continue to be due under the terms of the deed of trust *and shall be all due and payable upon the consummation of the sale of the Union Sugar [R]anch*."  (Emphasis added.)  Reading the ACD and RFL together, the trial court reasonably concluded that the sale of USR is a condition precedent to cancellation of the RFL.  Phrased differently, the only way Thomas can cancel the RFL is to sell the USR.

Thomas claims that the ACD and RFL have different cancellation rights that do not depend upon one another.  The argument is based on the theory that paragraph 23 of the RFL (cancellation of the RFL) gives Thomas the right to cancel the RFL if he pays the underlying obligations and reimburses Andrew for the advances.  But early cancellation of the RFL would be contrary to the ACD which provides that the "renegotiated farm lease shall be fully and completely performed by [William] and [Thomas] . . . including the extended term thereof . . . ."  The testimony and Twitchell's letters show that the 26-year lease term was to ensure that the underlying obligations were paid in full and to ensure that Andrew would receive half the net rents  from November 1, 2016 to October 31, 2020.[4]  At trial, Thomas acknowledged that Andrew's rent share would be $240,000 between 2016 and 2020.

The trial court reasonably concluded that the RFL cancellation clause may not be used to trump the ACD and exclude Andrew from receiving his share of the rents after he refinanced his ranch (Main Street Ranch) and paid off the underlying obligations.  The right to cancel the RFL, as described in paragraph 23, is further

---

[4] Andrew testified that the sale "was upside-down for a long time" and, now that the rents are more than the payments on the underlying obligations, "the hard times should be over and we should be collecting . . . this money back.  And I still don't believe I'll collect all of my advances back . . . ."

9

limited by paragraph 13 of the RFL which provides that Andrew "may farm all or a portion of the leased premises and *continue to farm the same for so long as all of the underlying obligations are prepaid at least one year in advance*."  (Emphasis added.)

At the hearing on the motion for new trial, the trial court explained that Thomas could pay off the AIN and deed of trust without selling the property. Thomas's attorney argued that the judgment could be read to mean that the sale of the property was a condition precedent to paying off the AIN and deed of trust.  The trial court responded:  "No, that's not my intent.  It's not a condition precedent . . . .  It's just if the property is sold by . . . plaintiff and his brother, then Andrew must be paid off."

Thomas's attorney asked the trial court to "clear that up a little bit, just to make sure somebody else who reads that in the future doesn't have a misunderstanding."  Thomas submitted a proposed order containing the language he seeks on appeal (i.e., that Thomas cannot pay off the AIN unless the USR is sold). Andrew objected and the trial court issued its own order omitting the language proposed by Thomas.  There is no merit to the argument that the judgment misstates the trial court's findings or should be modified.

*1985 Judgment lien*

Thomas also requested that the trial court order Andrew to "pay" a 1985 judgment lien that was recorded before Andrew bought and resold USR.  Andrew testified that he would relieve Thomas of responsibility for the $500,000 lien if the RFL "is left intact."

Thomas argues that Andrew should be ordered to pay the judgment lien because it his contractual responsibility.  But that misstates the RFL which provides that "Tenant agrees to keep the leased premises free and clear of all liens . . . arising out of Tenant's operation of the premises . . . ."  Andrew has no contractual obligation to pay a judgment lien recorded before the RFL was executed.

At the hearing on a motion for new trial, the trial court stated that it would not order Andrew to pay the judgment lien because the lien could be removed by other means.  Andrew could void the lien in bankruptcy court or get the lienholder

10

to agree to transfer the lien to other property. If Andrew was ordered to pay the judgment lien, it would have the unintended consequence of making the judgment creditor a third party beneficiary and giving the judgment creditor the right to sue Andrew.

The judgment provides that removal of the 1985 judgment lien "shall be the sole responsibility of Andrew Adam" and that Andrew "shall indemnify, defend and hold plaintiffs harmless from said judgment . . . ." As worded, the judgment is like a title insurance policy and adequately protects Thomas's ownership rights. (See, e.g., *Rosen v. Nations Title Ins. Co.* (1997) 56 Cal.App.4th 1489, 1499.) We reject the argument that the judgment should be corrected to say that Andrew must pay the judgment lien.[5]

*Additional Declaratory Relief*

Thomas requests that we grant additional relief and render our "own judgment in order to avoid future delay or expense to the parties."[6] Reviewing courts do not make advisory opinions based on a hypothetical state of facts. (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 998; *Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110, 117.) The trial court was concerned that

---

[5] After the trial court granted Thomas's motion to reopen and receive expert testimony on the payoff amount, it modified the statement of decision to provide that Andrew "shall pay, indemnify, and hold harmless plaintiffs from said judgment lien." At the July 6, 2011 hearing on attorney's fees, Thomas argued that the judgment should be modified to say that Andrew must defend, indemnify and hold Thomas harmless on the 1985 lien. The trial court agreed and signed a proposed judgment, omitting the word "pay." It did not err. "[A] court is not bound by its statement of intended decision and may enter a wholly different judgment than that announced." (*Canal-Randolph Anaheim, Inc. v. Wilkoski* (1978) 78 Cal.App.3d 477, 494.)

[6] Thomas requests that we decide whether the sale and leaseback "debt" will be deemed paid in full when the RFL expires on October 31, 2020. Thomas also wants a determination that the Cancellation Clause in paragraph 23 of the RFL gives him the right to refinance the USR and pay off Andrew.

11

"William is not a party to this action and therefore the Court believes that it cannot order the Renegotiated Farm Lease terminated." We, too, are precluded from considering hypothetical future actions the brothers may take in what the trial court characterized as "a family broken apart by financial dealings." Wise adjudication has its own time for ripening. (*Sierra Club v. California Dept. of Parks & Recreation* (2012) 202 Cal.App.4th 735, 738.)

Thomas's remaining arguments have been considered but merit no further discussion.

The judgment is affirmed. Andrew is awarded costs on appeal.

<u>NOT TO BE PUBLISHED.</u>

YEGAN, J.

We concur:

GILBERT, P. J.

PERREN, J.

12

Arthur A. Garcia, Judge

Superior Court County of Santa Barbara

_____


Brenneman Juarez & Adam, LLP, Richard C. Brenneman for Plaintiffs and Appellants.

The Law Offices of Robert D. Reed, Robert D. Reed for Defendant and Respondent.